### Case No. 4,936.

**The FOREST.**

[1 Ware. 429.] [2]

District Court, D. Maine. Oct. 26, 1837.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Edward H. Daveis, Esq.]

Mr. Haines, for libellants.
Fessenden & Deblois, for respondents.

WARE, District Judge. The question whether the deductions claimed to be made in this case by way of set-off should be allowed, depends on the true construction of the 8th section of the act of congress of July 20, 1790, c. 56 [2 Bior. & D. Laws, 114; 1 Stat. 134, c. 29], and the act of March 2, 1805, c. 442 [3 Bior. & D. Laws, 657; 2 Stat. 330, c. 28]. The act of 1790 requires every vessel of 150 tons and upwards, navigated by ten or more persons, when bound on a foreign voyage, to be "provided with a chest of medicines, put up by some apothecary of known reputation, and accompanied by directions for administering the same; and said medicines shall be examined by the same, or some other apothecary once at least in every year, and supplied with fresh medicines in the place of such as have been used, or spoiled; and in default of having such medicine chest so provided, and kept fit for use, the master or commander of such ship or vessel, shall provide and pay for all such advice, medicine, or attendance of physicians, as any of the crew shall stand in need of, in case of sickness, at every port or place where the ship or vessel may touch, or trade, during the voyage, without any deduction from the wages of such sick seaman or mariner." The act of March 2, 1805, extends the provisions of this section to vessels of seventy-five tons, navigated by six or more persons, and bound to any port in the West Indies.

It will aid us in giving a construction to the statute, to consider what was the state of the law when it was enacted. Before the passing of this act, a seaman, when he received any injury while in the service of the vessel, or became sick during the voyage, and the sickness was not occasioned by his own fault, was entitled to be cured at the vessel's expense. The whole expense of his sickness, that for medical advice and attendance, as well as other expenses, whether he remained on board or was put on shore, was a charge on the ship. In the case of Harden v. Gordon [Case No. 6,047], where this subject was most fully and learnedly examined, it is shown that this principle, which makes the expenses of the sickness of any of the crew a charge on the vessel, is adopted as customary law, or incorporated in their maritime codes by nearly every nation of Europe. It is shown also to have been established among the usages and customs of the sea, from the earliest epoch to which we can trace the elements of the existing maritime law of the great commercial commonwealth of Christendom. It is found in nearly all those early digests of maritime law, which in various places were made for the regulation and government of maritime commerce upon the revival of civilization, letters, and the peaceful intercourse of commerce during the middle ages. It is not certain that the principle does not remount to an age even anterior to the Christian era, as we find traces of it in that ancient compilation of law which goes under the name of maritime law of the Rhodians. 1 Pardessus, Collection des Lois Maritimes, c. 2, p. 258; Id. c. 46, p. 257. And it is not questioned that this generally received principle has been adopted as part of the maritime law of this country. It has been supposed by learned judges that this provision in the act of congress was intended as a benefit to the mariner, and not as a measure of relief to the shipowner,—Walton v. The Neptune [Case No. 17,135]; Swift v. The Happy Return [Id. 13,697]; Lamson v. Westcott [Id. 8,035]; that it was not the intention of the legislature to deprive the mariner of any advantage, which the law before allowed him, but to provide additional security for his health and comfort. And this is certainly the inference which would naturally arise from the terms in which the law is expressed. It imposes on owners a new obligation, to which they were not subject by the maritime law, without liberating them in its terms from any liabilities, to which they were subject before. And it professedly subjects the master, within the range of whose peculiar duty it would be to see that the law is complied with, to a personal liability in case it is not; to which perhaps it may have been doubted whether he was subject by the general maritime law. For though there could be no doubt of the liability of the master for wages upon the ground of the contract, it might not have been deemed so certain that he was liable for the extraordinary expense of sickness of the crew, a liability not resulting from the terms

of the contract. but imposed on the owners by the policy of the law. Harden v. Gordon [Id. 6,047].

But whatever may have been the intention of the legislature. the act appears early to have received a judicial construction by which the owners were exempted from their liability for medical advice and attendance in case a medicine chest was provided in compliance with the law. To this extent the act was held to be an implied repeal of the pre-existing law. The medicine chest. with the directions for the use of the medicine, was held to be a substitute for the advice of a physician. Though in the ordinary complaints with which seamen are affected, the medicine may without doubt be safely administered by the master with the aid of the printed directions which accompany the chest, yet it cannot be doubted that it would be an act of temerity in him to undertake to prescribe under such general directions as those with which he is furnished, for the case of dangerous and malignant disease, such as the libellants were affected with in this case; and great doubts have been repeatedly expressed, allowing the received construction of the statute to be correct, whether it ought to be extended to exempt the owners from the charge for medical advice in such cases. Swift v. The Happy Return [supra]; Lamson v. Westcott [supra].

But admitting that the providing of a chest of medicines with proper directions for their use, by the operation of the statute, exempts the owners from the charge for medical advice and attendance, it can only have that effect when the seamen can have the benefit of the medicine, administered under the printed directions for its use by the master or some other person fit to be intrusted with so delicate a duty. If the medicine chest is inaccessible to the seaman, it is the same thing to him as though none were provided. If the medicine chest is deemed by the law a substitute and an equivalent for the advice of a physician. it can only be so when the seaman can have the use of it, safely and properly administered. It cannot be pretended that he has the advantage of the medicine, when there is no person on board by whom it can be administered, or, what amounts to the same thing. no person of such intelligence and discretion, that it would be safe to intrust him with a duty of so much delicacy and responsibility. Would there be any safety in sending a common sailor to the medicine chest with the printed directions to serve out medicine to a patient laboring under a disease of such violence as the yellow fever? Surely but one answer can be given to this question. But the seamen are as much entitled to the benefit of the printed directions as they are to the medicine. and the owners, to bring themselves within the statute exemption, are as much bound to furnish one as the other. It may be said that the owners have done all in their power; they have provided a sufficiency of medicine with directions for its use; and having done all that is required by law, they are not in fault and ought not to be rendered responsible for the act of God. "Casus fortuitus nemini facit injuriam." The general principle of law is admitted. But it applies with equal force in favor of the seaman as it does for the owners. It is no fault of his that the medicine is inaccessible to him. Still the consequences of this unavoidable casualty must be borne by one or the other. On whom then does the law leave it? When a party claims under a special act of the legislature an exemption from any particular liability to which he is subject by the general law, he must show that the condition on which the exemption is granted, has been complied with. It is no excuse for him to say that a fortuitous event has rendered the performance of the condition impossible. When a right is to vest on the performance of a condition, and the condition becomes impossible before the right vests, the right is gone; and when a party claims the benefit of an exception, he must bring himself within the exception. It is not enough for him to say that he was prevented from doing it by an overruling fatality.

The application of these principles to the section of the law under consideration does not rest in speculation merely. It has been established by judicial decisions. In the case of The George in the circuit court of Massachusetts, and in the same case in the district court.—The George [Case No. 5,329]; Lamson v. Westcott [supra],—it was decided that if a sick seaman was put on shore for the convenience of the ship, the expense of medical advice, as well as the other expenses of sickness, were a charge on the vessel, notwithstanding there might be a sufficient medicine chest on board. The decision rests on this plain principle, that the seaman is deprived, without his own fault, of that which the law has directed as a substitute and equivalent for the advice and attendance of a physician; that he is entitled to the benefit of the directions for the use of the medicine, and to their being administered by some person fit to be intrusted with such a service, as well as to the medicine itself.

If these principles be applied to the facts of the present case, the conclusion to which they lead is very obvious. The master was first taken down sick with the yellow fever, a disease in that climate of the most dangerous and malignant character; and which ordinarily proves fatal unless the most powerful remedies are promptly applied. Before his recovery the disease simultaneously seized the mate and three of the men; and after a short interval, and before the full recovery of those first taken sick, the fourth man. If the disease had been of a less malignant character than it in fact was. of what use would a chest of medicine be on board a vessel when the whole ship's crew were sick? Would it be safe or prudent for the sick to prescribe

for the sick? Would it not be considered as the height of imprudence, when the advice of a physician could be obtained? The mate seems to have thought so, and finding himself and all the crew, excepting one man, with the symptoms of the approaching fever upon them, immediately called a physician.

It is said that some of the men objected, and it is argued that as the physician was not called at their request, the expense ought not to be charged upon them. It is also said that the advice of a physician might not have been necessary. I do not, however, put my opinion on that ground. I think that there was no reason to doubt that the disease was the yellow fever, and that the advice of a physician was necessary, not improbably indispensably so, to the preservation of their lives. The fever was then prevailing in the place with great virulence, and swelling to a melancholy extent the bills of mortality. When the physician saw his patients he pronounced the malady to be the yellow fever, prescribed for it as such, and they all recovered under his prescriptions. In my opinion the mate was not only justifiable in calling a physician without the consent of the seamen, but would have been hardly excusable if he had not done so. All, who are conversant in maritime affairs and acquainted with the habits of seamen, know their carelessness with regard to the exposure of their own health and safety. The apprehension that the earnings of the voyage may be absorbed by physicians' bills, is more than enough to overbalance their fears for their own health. It is for these reasons that the maritime law, with a provident regard, not less to the general interest of commerce than to the safety and health of this valuable class of the community, made the expenses of the sickness of the crew a charge on the vessel. It is the duty of the master to call in the aid of a physician when it is necessary to preserve the health of his men. The case now before us is a strong one to illustrate the wise forecast of those who introduced this principle into the customary law of the sea, and to show that in its operation it is equally beneficial to the owners and the mariners. If the advice of a physician had not been obtained, it is, to say the least, probable that this vessel might have lost her whole crew. It was far better for the owners, in point of economy, and looking to the prospects of the voyage in a mere pecuniary point of view, to say nothing of the duties of humanity, to pay the physician's bill, than to risk the loss of the crew and incur the extraordinary expense and delay of collecting a new crew in a sickly port.

My opinion is that the wages are due without the deduction of the charges for medical advice and attendance, that it is not the intention of the law that the fact of a medicine chest being provided with suitable medicines and directions, should be held as a substitute for the advice and attendance of a physician, in cases in which the seaman without any fault of his own, cannot have the benefit of them, from whatever cause it may be, whether because it becomes necessary to put him ashore, or because there is no person on board by whom the medicine can be administered.