## AGUILAR v. STANDARD OIL CO. OF NEW JERSEY.*

No. 454.  Argued March 2, 3, 1943.—Decided April 19, 1943.

*Mr. George J. Engelman* for petitioner in No. 454; and *Mr. Joseph W. Henderson,* with whom *Mr. George M. Brodhead, Jr.* was on the brief, for petitioner in No. 582.

*Mr. Walter X. Connor,* with whom *Mr. Vernon S. Jones* was on the brief, for respondent in No. 454; and *Mr. Abraham E. Freedman,* with whom *Messrs. Paul M. Goldstein* and *Charles Lakatos* were on the brief, for respondent in No. 582.

---

*Together with No. 582, *Waterman Steamship Corp.* v. *Jones,* on writ of certiorari, 317 U. S. 621, to the Circuit Court of Appeals for the Third Circuit.

Mr. Justice Rutledge delivered the opinion of the Court.

The question presented by these cases is whether a shipowner is liable for wages and maintenance and cure to a seaman who, having left his vessel on authorized shore leave, is injured while traversing the only available route between the moored ship and a public street. The injury in No. 582 occurred while the seaman was departing for his leave. That in No. 454 occurred while he was returning.

The complaint in No. 582 discloses that the plaintiff, respondent here, was a messman on the Steamship Beauregard, owned by defendant. On January 16, 1941, the vessel, which apparently was engaged in the coastwise trade between New Orleans and East Coast and Gulf ports, was moored to Pier C, Port Richmond, Philadelphia. At about 6 p. m. plaintiff left the ship on shore leave. As he was proceeding through the pier toward the street, all the lights were extinguished. In the ensuing darkness, he fell into an open ditch at a railroad siding. This caused injuries which required treatment and prevented him from resuming his usual duties. This action followed, for maintenance and cure and wages. On defendant's motion, the District Court dismissed the complaint. The ground assigned was that, at the time of his injury, plaintiff was not ashore on the ship's business. The Third Circuit Court of Appeals reversed and remanded (130 F. 2d 797), holding that, on the facts stated in the complaint, defendant was liable for maintenance and cure and wages.

The stipulation of facts in No. 454 discloses that on April 18, 1938, the defendant's vessel, the Steamship E. M. Clark, was lying docked at the premises of the Mexican Petroleum Company, in Carteret, New Jersey, which defendant neither owned, operated, nor controlled. Petitioner, a member of the crew, obtained permission from

the master and went ashore on his own personal business. In order to reach the vessel on returning from shore leave, he had to pass through the premises of the Mexican Petroleum Company. After he had gone through the entrance gate and while he was walking on the roadway of those premises about a half mile from the ship, he was struck and injured by a motor vehicle which was neither owned, operated, nor controlled by the defendant. Petitioner brought this action to recover $10,000, the expense of his maintenance and cure for the injuries so incurred. The District Court dismissed the complaint, and on appeal the Second Circuit Court of Appeals affirmed. 130 F. 2d 154. Both courts acted on the ground that in going ashore on personal business the plaintiff left the service of the ship and therefore no liability for maintenance and cure attached.

The cases were brought here to resolve the conflict thus presented on an important question of maritime law.

All admit the shipowner is liable if the injury occurs while the seaman is "in the service of the ship," and the issue is cast in these ambiguous terms, the parties giving different meanings to the ancient phrase.

The claimants say it includes the whole period of service covered by the seaman's articles; and, if he is injured during this time, the right is made out, unless it is shown by way of defense he has forfeited it by misconduct causing the injury. Since the injuries here took place during the period and there was admittedly no misconduct, it is said the claims are established. Corollaries of this view are that recovery is not conditioned on showing the injury was received while the seaman was at work or doing some errand for the employer, and that going ashore with leave, or returning from it, is part of being "in the service of the ship," whether or not it was to perform such an errand.

The shipowners regard the phrase more narrowly. In their view, it requires the seaman to be injured, if ashore,

while he is "on duty" or at work, doing some task connected with the vessel's business. Going ashore simply for diversion and relief from its routine and discipline, or for any matter personal to the seaman, takes him out of the service of the ship; and the departure is made the moment he steps off deck and onto the dock or pier, perhaps as he descends the gangplank or ladder. Cf. *The President Coolidge*, 23 F. Supp. 575 (D. C.). Likewise, return is not made until he is on board again. Cf. *Lilly* v. *United States Lines Co.*, 42 F. Supp. 214 (D. C.). In this view, it is of no moment whether the injury results from the seaman's fault or misconduct or from causes entirely beyond his control.

It will aid in determining the scope of the liability to consider its origin and nature.

From the earliest times, maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natural elements, and the limitations of human adaptability to work at sea, enlarge the narrower and more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working,[1] that accompany most land occupations. Furthermore, the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude for others to these extraordinary hazards and limitations of ship life.

Accordingly, with the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon the owners of

---

[1] *Cf.* Holmes, J., dissenting in *Tyson & Brother* v. *Banton*, 273 U. S. 418, 447.

ships.[2]   In this country these notions were reflected early, and have since been expanded, in legislation designed to secure the comfort and health of seamen aboard ship,[3] hos-

---

[2] As Mr. Justice Story, then on circuit, observed in *Harden* v. *Gordon*, 2 Mason 541, 11 Fed. Cas. No. 6047 (C. C.), at 483, "Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour.   They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence.   If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. . . .   If these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen.   The master will watch over their health with vigilance and fidelity.   He will take the best methods, as well to prevent diseases, as to ensure a speedy recovery from them.   He will never be tempted to abandon the sick to their forlorn fate; but his duty, combining with the interest of his owner, will lead him to succor their distress, and shed a cheering kindness over the anxious hours of suffering and despondency.   Beyond this, is the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation.   Every act of legislation which secures their healths, increases their comforts, and administers to their infirmities, binds them more strongly to their country; and the parental law, which relieves them in sickness by fastening their interests to the ship, is as wise in policy, as it is just in obligation.   Even the merchant himself derives an ultimate benefit from what may seem at first an onerous charge.   It encourages seamen to engage in perilous voyages with more promptitude, and at lower wages.   It diminishes the temptation to plunderage upon the approach of sickness; and urges the seamen to encounter hazards in the ship's service, from which they might otherwise be disposed to withdraw."

[3] *E. g.*, Act of July 20, 1790, c. 29, § 8, 1 Stat. 134; Act of June 7, 1872, c. 322, § 41, 17 Stat. 270; 46 U. S. C. §§ 666, 667, requiring that ships carry a minimum supply of medicines and antiscorbutics.   Act of July 20, 1790, c. 29, § 9, 1 Stat. 135; Act of June 7, 1872, c. 322, § 36, 17 Stat. 269; Act of Dec. 21, 1898, c. 28, § 12, 30 Stat. 758; R. S. 4565; 46 U. S. C. §§ 661, 662, requiring that ships carry sufficient and adequate stores and water for the crew.   See also 17 Stat. 277, 46 U. S. C. § 713.   Act of June 7, 1872, c. 322, § 42, 17 Stat. 270,

pitalization at home [4] and care abroad.[5] The statutes are uniform in evincing solicitude that the seaman shall have at hand the barest essentials for existence. They do this in two ways. One is by recognizing the shipowner's duty to supply them, the other by providing for care at public expense. The former do not create the duty. That existed long before the statutes were adopted. They merely recognize the preëxisting obligation and put specific legal sanctions, generally criminal, behind it. Compare *Harden* v. *Gordon,* 2 Mason 541, 11 Fed. Cas. No. 6047 (C. C.); *The George,* 1 Sumn. 151, 10 Fed. Cas. No. 5329 (C. C.); *The Forest,* 1 Ware 429, 9 Fed. Cas. No. 4936 (D. C.). The provisions for public assistance were not intended to relieve the shipowner of his duty. On the contrary, their purpose was to make sure the seaman would have care, if the employer should fail to give it and in the rarer cases to which his obligation does not extend. The legislation therefore gives no ground for making inferences adverse to the seaman or restrictive of his rights. Cf. *Reed* v. *Canfield,* 1 Sumn. 195, 20 Fed. Cas. No. 11,641 (C. C.). Rather it furnishes the strongest basis for regarding them broadly, when an issue concerning their scope arises, and particularly when it relates to the general character of relief the legislation was intended to secure.

---

R. S. 4572; Act of June 26, 1884, c. 121, § 11, 23 Stat. 56; Act of Dec. 21, 1898, c. 28, § 15, 30 Stat. 759; 46 U. S. C. §§ 669, 670, providing that certain basic clothes and heating facilities be furnished by the shipowner; 46 U. S. C. §§ 672–672 (c), 673, prescribing qualifications and quotas for crews, and watch divisions.

[4] Act of July 16, 1798, c. 77, 1 Stat. 605; Act of March 2, 1799, c. 36, 1 Stat. 729; 2 Stat. 192; R. S. 4808–13; 24 U. S. C. §§ 1, 6, 8, 11, 193.

[5] Act of Feb. 28, 1803, c. 9, § 4, 2 Stat. 204; 2 Stat. 651; R. S. 4577; 46 U. S. C. § 678, requiring consuls in the case of sick and destitute seamen abroad to provide for their subsistence and return passage to the United States.

Among the most pervasive incidents of the responsibility anciently imposed upon a shipowner for the health and security of sailors was liability for the maintenance and cure of seamen becoming ill or injured during the period of their service.[6]  In the United States this obligation has been recognized consistently as an implied provision in contracts of marine employment.[7]  Created thus with the contract of employment, the liability, unlike that for indemnity or that later created by the Jones Act,[8] in no sense is predicated on the fault or negligence of the shipowner. Whether by traditional standards he is or is not responsible for the injury or sickness, he is liable for the expense of curing it as an incident of the marine employer-employee relationship.[9]  So broad is the shipowner's obliga-

---

[6] See, e. g., Laws of Oleron, Articles VI, VII; Laws of Wisbuy, Articles XVIII, XIX; Laws of the Hanse Towns, Articles XXXIX, XLV; Marine Ordinances of Louis XIV, of Marine Contracts, Title Fourth, Articles XI, XII, compiled in 30 Fed. Cas. 1171–1216; cf. Harden v. Gordon, supra.

The Laws of Oleron are typical of the provision for injuries: "If any of the mariners hired by the master of any vessel, go out of the ship without his leave, and get themselves drunk, and thereby there happens contempt to their master, debates, or fighting and quarrelling among themselves, whereby some happen to be wounded: in this case the master shall not be obliged to get them cured, or in any thing to provide for them, but may turn them and their accomplices out of the ship; . . . but if by the master's orders and commands any of the ship's company be in the service of the ship, and thereby happen to be wounded or otherwise hurt, in that case they shall be cured and provided for at the costs and charges of the said ship." Article VI.

[7] Harden v. Gordon, 2 Mason 541, 11 Fed. Cas. No. 6047 (C. C.); The Atlantic, Abb. Adm. 451, 2 Fed. Cas. 620 (D. C.); Cortes v. Baltimore Insular Line, 287 U. S. 367, 371.

[8] Cf. The Osceola, 189 U. S. 158; Pacific S. S. Co. v. Peterson, 278 U. S. 130; O'Donnell v. Great Lakes Dredging Co., ante, p. 36; Brown v. The Bradish Johnson, 1 Woods 301, 4 Fed. Cas. No. 1992 (C. C.); The A. Heaton, 43 F. 592 (C. C.); The Mars, 149 F. 729 (C. C. A.).

[9] The City of Alexandria, 17 F. 390 (D. C.); The A. Heaton, 43 F. 592 (C. C.); The Wensleydale, 41 F. 829 (D. C.); Sorenson v. Alaska

tion, that negligence or acts short of culpable misconduct on the seaman's part will not relieve him of the responsibility.  *Peterson* v. *The Chandos,* 4 F. 645 (D. C.); see also *The J. F. Card,* 43 F. 92 (D. C.); *The Ben Flint,* 1 Abb. (U. S.) 126, 3 Fed. Cas. No. 1299 (D. C.).  Conceptions of contributory negligence, the fellow-servant doctrine, and assumption of risk have no place in the liability or defense against it.  Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection.  *The Ben Flint, supra.* The traditional instances are venereal disease [10] and injuries received as a result of intoxication,[11] though on occasion the latter has been qualified in recognition of a classic predisposition of sailors ashore.[12]  Other recent cases, however, disclose a tendency to expand these traditional exceptions.[13]

Consistently with the basic premises of the liability, it was early suggested that the risks which it covered were not only those arising in the actual performance of the seaman's duties.  *Reed* v. *Canfield,* 1 Sumn. 195, 20 Fed. Cas. No. 11,641 (C. C.); *Ringgold* v. *Crocker,* Abb. Adm. 344, 20 Fed. Cas. No. 11,843 (D. C.).  Unlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his em-

---

*S. S. Co.,* 247 F. 294 (C. C. A.); *Peterson* v. *The Chandos,* 4 F. 645 (D. C.); *cf. Seely* v. *City of New York,* 24 F. 2d 412 (C. C. A.); *cf. Reed* v. *Canfield,* 1 Sumn. 195, 20 Fed. Cas. No. 11,641 (C. C.).

[10] *Pierce* v. *Patton,* Gilp. 435, 19 Fed. Cas. No. 11,145 (D. C.); *The Alector,* 263 F. 1007 (D. C.); *Chandler* v. *The Annie Buckman,* 21 Betts 112, 5 Fed. Cas. No. 2591a (D. C.); *Zambrano* v. *Moore-McCormack Lines,* 131 F. 2d 537 (C. C. A.); *Wytheville,* 1936 A. M. C. 1281 (D. C.)

[11] *Barlow* v. *Pan Atlantic S. S. Corp.,* 101 F. 2d 697 (C. C. A.); *The Berwindglen,* 88 F. 2d 125 (C. C. A.); *Lortie* v. *American-Hawaiian S. S. Co.,* 78 F. 2d 819 (C. C. A.); *Oliver* v. *Calmar S. S. Co.,* 33 F. Supp. 356 (D. C.).

[12] *The Quaker City,* 1 F. Supp. 840 (D. C.).

[13] *Cf.* text and note 15 *infra.*

ployer nor wholly free to dispose of his leisure as he sees fit. Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the framework of his existence. For that reason, among others, his employer's responsibility for maintenance and cure extends beyond injuries sustained because of, or while engaged in, activities required by his employment. In this respect it is a broader liability than that imposed by modern workmen's compensation statutes.[14] Appropriately it covers all injuries and ailments incurred without misconduct on the seaman's part amounting to ground for forfeiture, at least while he is on the ship, "subject to the call of duty as a seaman, and earning wages as such." *The Bouker No. 2*, 241 F. 831, 833 (C. C. A.), certiorari denied, 245 U. S. 647; *Calmar S. S. Co.* v. *Taylor*, 303 U. S. 525, 527–8; *Holm* v. *Cities Service Transportation Co.*, 60 F. 2d 721 (C. C. A.); *Highland* v. *The Harriet C. Kerlin*, 41 F. 222 (C. C.); *The Quaker City*, 1 F. Supp. 840 (D. C.); compare *Neilson* v. *The Laura*, 2 Sawy. 242, 17 Fed. Cas. No. 10,092 (D. C.); *Callon* v. *Williams*, 2 Lowell 1, 4 Fed. Cas. No. 2324 (D. C.).[15]

When the seaman's duties carry him ashore, the shipowner's obligation is neither terminated nor narrowed.[16]

---

[14] *Compare Yukes* v. *Globe S. S. Corp.*, 107 F. 2d 888 (C. C. A.); but *cf. States S. S. Co.* v. *Berglann*, 41 F. 2d 456 (C. C. A.), certiorari denied, 282 U. S. 868; *Holm* v. *Cities Service Transportation Co.*, 60 F. 2d 721 (C. C. A.).

[15] The recent tendency to confine the scope of the obligation to those shipboard injuries which are caused by the requirements of the seaman's duties (*Meyer* v. *Dollar S. S. Lines*, 49 F. 2d 1002 (C. C. A.); *cf. Brock* v. *Standard Oil Co.*, 33 F. Supp. 353 (D. C.)) is consonant neither with the liberality which courts of admiralty traditionally have displayed toward seamen, who are their wards, nor with the dictates of sound maritime policy. *Calmar S. S. Co.* v. *Taylor, supra,* at 529.

[16] See, *e. g.*, Laws of Oleron, Art. VI, VII; Laws of Wisbuy, Art. XVIII, XIX; Laws of Hanse Towns, Art. XXXIX, XLV; see also *The*

When he leaves the ship contrary to orders, however, the owner's duty is ended.[17]   Between these extremes are the instant cases, raising for the first time here the question of the existence and scope of the shipowner's duty when the seaman is injured while on shore leave but without specific chore for the ship.   Liability in that circumstance was obscured in the first maritime codes,[18] and although early suggested has been recognized only implicitly in lower federal courts.[19]   Very recently it has been explicitly denied in several district courts.[20]

We think that the principles governing shipboard injuries apply to the facts presented by these cases.   To relieve the shipowner of his obligation in the case of injuries incurred on shore leave would cast upon the seaman hazards encountered only by reason of the voyage.   The assumption is hardly sound that the normal uses and purposes of shore leave are "exclusively personal" and have no relation to the vessel's business.   Men cannot live for long cooped up aboard ship, without substantial impairment of their efficiency, if not also serious danger to discipline.   Relaxation beyond the confines of the ship is

---

*Montezuma,* 19 F. 2d 355 (C. C. A.); *Gomes* v. *Pereira,* 42 F. Supp. 328 (D. C.).

[17] Sound reasons of discipline long have impelled this rule.   *Cf., e. g.,* Laws of Oleron, Art. VII; Marine Ordinances of Louis XIV, *supra;* Laws of Wisbuy, *supra;* and compare *Pierce* v. *Patton, supra,* note 10.

[18] Thus, while the Laws of Oleron and the Marine Ordinances of Louis XIV, *supra,* relieve from liability for injuries incurred while on shore without leave, they say nothing on the question here involved. Similarly, the Laws of Wisbuy, *supra,* are ambiguous on this point. The Laws of the Hanse Towns suggest that any injuries received otherwise than in the ship's service are not within the right to maintenance and cure.

[19] *E. g., Reed* v. *Canfield, supra,* note 9; *The Berwindglen, supra,* note 11; *cf. The J. M. Danziger,* 1938 A. M. C. 685 (D. C.).

[20] *Smith* v. *American South African Line,* 37 F. Supp. 262 (D. C.); *Wahlgren* v. *Standard Oil Co.,* 42 F. Supp. 992 (D. C.); *Collins* v. *Dollar Steamship Lines,* 23 F. Supp. 395 (D. C.).

necessary if the work is to go on, more so that it may move smoothly. No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it. Even more for the seaman than for the landsman, therefore, "the superfluous is the necessary . . . to make life livable" [21] and to get work done. In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.

The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports. If, in those surroundings, the seaman, without disqualifying misconduct, contracts disease or incurs injury, it is because of the voyage, the shipowner's business. That business has separated him from his usual places of association. By adding this separation to the restrictions of living as well as working aboard, it forges dual and unique compulsions for seeking relief wherever it may be found. In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly, it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment.

It was from considerations of exactly this character that the liability for maintenance and cure arose. From them, likewise, its legal incidents were derived. The shipowner owes the protection regardless of whether he is at fault; the seaman's fault, unless gross, cannot defeat it; unlike the statutory liability of employers on land, it is not limited to strictly occupational hazards or to injuries which have an immediate causal connection with an act of labor. An obligation which thus originated and was shaped in response to the needs of seamen for protection from the

---

[21] Holmes, J., dissenting in *Tyson & Brother* v. *Banton*, 273 U. S. 418, 447.

hazards and peculiarities of marine employment should not be narrowed to exclude from its scope characteristic and essential elements of that work. And, indeed, no decision has been found which so narrows the shipowner's parallel obligation in the case of sickness or disease. Rather, the implications of existing authority point the other way. Cf. *The Bouker No. 2, supra*.[22] The considerations, including those of public interest adverted to by Mr. Justice Story, which support the liability for illness,[23] or for injuries received aboard ship, likewise sustain it for injuries incurred on shore leave, as were those now in issue. To exclude such injuries from the scope of the liability would ignore its origins and purposes.

There is strong ground, therefore, for regarding the right to maintenance and cure as covering injuries received without misconduct while on shore leave. Certainly the nature and foundations of the liability require that it be not narrowly confined or whittled down by restrictive and artificial distinctions defeating its broad and beneficial purposes. If leeway is to be given in either direction, all the considerations which brought the liability into being dictate it should be in the sailor's behalf. In this view,

---

[22] See also *Holmes* v. *Hutchinson*, Gilp. 447, 12 Fed. Cas. No. 6639 (D. C.); *The Forest*, 1 Ware 429, 9 Fed. Cas. No. 4936 (D. C.); *The Nimrod*, 1 Ware 1, 18 Fed. Cas. No. 10,267 (D. C.); and see cases cited *supra*, note 10.

[23] At the argument, it was suggested that a reason which might sustain the imposition of liability for sickness innocently contracted on shore leave, but not for injuries so incurred, would be the difficulty of proving origin ashore. The difficulty undoubtedly would exist in some cases, but hardly in all. No authority has been found which suggests this explanation. Rather, cases of illness, which are within the reason and policy of the liability, are indistinguishable from cases of injury received without misconduct. The risk of incidence is not less in the one case than in the other. The afflicted seaman is made as helpless and dependent by injury as by illness. His resources for meeting the catastrophe and his employer's burden are not greater because he is hurt rather than ill.

the nature and purposes of the liability do not permit dis tinctions which allow recovery when the seaman becomes ill or is injured while idle aboard, cf. *Calmar S. S. Co.* v. *Taylor,* 303 U. S. 525; *The Bouker No. 2,* 241 F. 831 (C. C. A.); *Holm* v. *Cities Service Transportation Co.,* 60 F. 2d 721 (C. C. A.); *The Quaker City,* 1 F. Supp. 840 (D. C.), or when doing some minor errand for the ship ashore, *Gomes* v. *Pereira,* 42 F. Supp. 328 (D. C.), but deny it when he falls from the ladder or gangplank as he leaves the vessel on shore leave, cf. *The President Coolidge,* 23 F. Supp. 575 (D. C.), or is returning from it, *Lilly* v. *United States Lines Co.,* 42 F. Supp. 214 (D. C.). Such refine- ments cut the heart from a protection to which they are wholly foreign in aim and effect. The sailor departing for or returning from shore leave is, sensibly, no more beyond the broad protection of his right to maintenance and cure than is the seaman quitting the ship on being discharged or boarding it on first reporting for duty. Cf. *The Michael Tracy,* 295 F. 680 (C. C. A.); *The Scotland,* 42 F. 925 (D. C.).

Plaintiffs here were injured while traversing an area between their moored ships and the public streets by an appropriate route. It is true that in No. 454 the area con- sisted of the extensive premises of the Mexican Petroleum Company, at whose dock the ship was moored. And it is said the shipowner should not be liable because he had no control over the premises. But it was the shipowner's business which required the use of those facilities. And his obligation to care for the seaman's injuries is, as has been shown, in no sense a function of his negligence or fault. While his ability to control conditions aboard ship may be to some extent an element in creating his responsibility, it is only one of many, is not definitive, and by no means determines the occasions on which his obli- gation arises. Consequently, the fact that the shipowner might not be liable to the seaman in damages for the

dock-owner's negligence, cf. *Todahl* v. *Sudden & Christenson*, 5 F. 2d 462 (C. C. A.), does not relieve him of his duty of maintenance and cure. We can see no significant difference, therefore, between imposing the liability for injuries received in boarding or quitting the ship and enforcing it for injuries incurred on the dock or other premises which must be traversed in going from the vessel to the public streets or returning to it from them. That much, at least, is within the liability. How far it extends beyond that point we need not now determine. And, in view of the ground on which we rest the decision, it is not necessary to consider the effects of the Shipowners' Liability Convention of 1936,[24] other than to state that it in no way alters the conclusion here reached.

---

[24] By presidential proclamation the Convention became effective for the United States and its citizens on October 29, 1939 (54 Stat. 1693). Article 2 provides:

"1. The shipowner shall be liable in respect of—
   (a) sickness and injury occurring between the date specified in the articles of agreement for reporting for duty and the termination of the engagement;
   (b) death resulting from such sickness or injury.

"2. Provided that national laws or regulations may make exceptions in respect of:
   (a) injury incurred otherwise than in the service of the ship;
   (b) injury or sickness due to the wilful act, default or misbehaviour of the sick, injured or deceased person;
   (c) sickness or infirmity intentionally concealed when the engagement is entered into.

"3. National laws or regulations may provide that the shipowner shall not be liable in respect of sickness, or death directly attributable to sickness, if at the time of the engagement the person employed refused to be medically examined."

Relevant material on the scope and effect of the Convention may be found in H. R. Rep. No. 1328, 76th Cong., 1st Sess., containing the interpretation by the Secretary of State; Record of Proceedings, International Labor Conference, 21st and 22d Sessions, Geneva, 1936, 249–51; International Labor Conference, Geneva, 1929, The Protec-

The judgment in No. 582 is affirmed; that in No. 454 is reversed and remanded to the District Court for further proceedings not inconsistent with this opinion.

*No. 582 affirmed.*
*No. 454 reversed.*

Mr. Justice Roberts did not participate in the consideration or decision of this case.

The Chief Justice thinks that the judgment in No. 454, *Aguilar* v. *Standard Oil Co.*, should be affirmed for the reasons stated in the opinion of the Circuit Court of Appeals below, 130 F. 2d 154.   In No. 582, *Waterman Steamship Corp.* v. *Jones,* he concurs in the result on the ground that the recovery was authorized by the Shipowners' Liability Convention, 54 Stat. 1695, which became effective before the date of respondent's injury.   He is of opinion that Article 2, Clause 1 of the treaty authorizing the recovery is self-executing, and that the exceptions permitted by Clause 2 are not operative in the absence of Congressional legislation giving them effect.   (See letter of Secretary of State to the President, dated June 12, 1939, quoted in H. R. Rep. No. 1328, 76th Cong., 1st Sess., pp. 5–7.)

---

tion of Seamen in Case of Sickness, 1st Discussion, 28–46; International Labor Conference, Geneva, 1931, The Protection of Seamen in Case of Sickness, 2d Discussion, 29–43, 161–2.   See also H. R. 6881, 76th Cong., 1st Sess.; 84 Cong. Rec. 10540; Hearings before Committee on Merchant Marine and Fisheries, House of Representatives, on H. R. 6881, 76th Cong., 1st Sess., *passim;* Hearings before Senate Committee on Commerce on H. R. 6881, 76th Cong., 3d Sess., *passim.*