## CHANDLER by ROSENFELD v. UNITED STATES et al.

United States District Court
S. D. New York.
April 26, 1949.

See also, D.C., 94 F.Supp. 580.

William L. Standard, New York City, (Jacquin Frank, New York City, of counsel; Herman B. Gerringer, New York City, on brief), for libelant.

John F. X. McGohey, U. S. Atty., New York City, (Howard F. Fanning, and Martin J. Norris, Special Assts. to the U. S. Atty., New York City, of counsel), for respondents.

LEIBELL, District Judge.

The libel in this suit contains two causes of action; one for damages in the sum of $50,000 for personal injuries received allegedly caused by the respondents' negligence, the other for maintenance and cure in the sum of $10,000. Libelant was a member of the crew of the S. S. Samuel Chase which sailed from the Port of New York May 19, 1944 in convoy for Belfast, Ireland. About the second week in July she sailed for Milford Haven, England, and on July 13th left for the Normandy Coast of France. Allied troops had landed on the beachhead June 5, 1944 and had driven some distance inland. The "Samuel Chase" had a cargo of supplies for the Army and anchored with a number of vessels off the Omaha Beachhead where she was partly unloaded by Army troops. She then moved to a point off Grand Camp and at about noon Saturday, July 22nd, anchored a mile off Utah Beachhead. On that evening libelant (Chandler) and a ship-mate, C. E. Hand, contrary to orders, went ashore on an Army dukw. They went some distance inland and gathered war souvenirs. An Army lieutenant had some M. Ps. take them back to the beach and they came back aboard ship about noon, Sunday, July 23rd. Included in Chandler's souvenirs were what are referred to in the testimony as two German flares, made of a bright metal, cylindrical in shape, somewhat like a shell, about 6 inches long and 1—½ inches in diameter, with a red button or detonator at one end. They may have been anti-personnel mines. On July 28th Chandler took the two flares and a belt of machine gun bullets down into the engineroom about 5 P.M. and while he was examining one of the flares it began to sizzle and he hurriedly threw it into a corrugated steel can used for waste rags. The flare exploded and Chandler was badly injured. In the engineroom at the time were K. R. McNeely, a member of the Navy armed guard who was washing some clothes behind the boilers, R. L. Knaggs, a fireman, who was watching the water gauges, and libelant Chandler, who was a wiper but was not then on watch. McNeely was not injured. Knaggs was hit by a number of small pieces of steel all along his right side from head to foot, but he was able to get up and sound an alarm. Chandler's right foot was mangled and had to be amputated six inches below the knee at an Army field hospital. His lower left leg and ankle, his arm, his face and both eyes were also injured. He lost the sight of his left eye. The cornea of his right eye was scarred.

The negligence charged in the libel is set forth in the Ninth Paragraph as follows:—"Ninth: On or about the 28th day of July, 1944, while the libelant was lawfully on board the S. S. 'Samuel Chase', suddenly, without any fault on his part and wholly and solely through the carelessness and negligence of the respondents, their agents, servants and employees, libelant was injured as a result of an explosion of a shell on board said vessel and as a result of which he sustained severe and permanent injuries."

The answer of the respondent states that the injuries received by Chandler "were the result of his own wilful misconduct in having an explosive aboard the steamship 'Samuel Chase' and in the handling thereof which was contrary to the rules of the Master with which he was fully familiar", and that they "were due solely to and were caused by Chandler's own negligence and not caused or contributed to in any manner by negligence of the respondent".

During the trial it developed that the negligence charged to the ship is based on Chandler's immaturity (he was 17 years old March 12, 1944) and the failure of the ship's officers to prevent him from going ashore and bringing the flares aboard, and the failure of the ship's officers to discover the flares during their daily routine inspection and to confiscate them. It is also charged that some of the officers actually knew that Chandler had the flares aboard and that they did nothing to take them from him.

The shipping articles which were signed by Chandler May 13, 1944 had pasted thereon a rider printed in red ink which stated, "The crew under no circumstances are to bring on board liquor or contraband articles". Printed in large type in black ink on the first page of the shipping articles was the statement: "Going on shore in foreign ports is prohibited except by permission of the Master"; and in small type: "No dangerous weapons or grog allowed, and none to be brought on board by the crew". A footnote referring to "weapons" reminded the crew that "Sec. 4608 R. S. [46 U.S.C.A. § 710] prohibits the wearing of sheath knives on shipboard, and the Master informs the crew of this law". A copy of the first page of the shipping articles (a forecastle card) was posted on the crew's Bulletin Board when the crew signed for the voyage.

When the "Samuel Chase" arrived off the Normandy beachhead the beach-master (Army Capt. Madison) came aboard and issued orders that there was to be no shore leave for merchant seamen and he cautioned against dangerous war souvenirs. Instructions to that effect were posted on the crew's Bulletin Board July 15th. No shore leave was granted to any of the officers or men while the vessel was off the Normandy beachheads.

About 125 Army stevedores came aboard. The vessel was first at the Omaha beachhead, then off Grand Camp and finally she anchored off Utah Beachhead about 11 A. M. on July 22nd, about a mile off shore. While the Army stevedores were discharging cargo, there were five scramble nets or debarkation nets, on each side of the vessel, and three or four Jacob's ladders. The cargo was loaded on to floats and small craft, and some of it went on Army dukws. While the cargo was being discharged the Army stevedores were in complete charge of the operation.

Chandler and Hand went ashore about midnight on the 22nd and came back about noon the next day. They did not have permission to go ashore. The ship provided no means for going ashore. They went aboard an Army dukw. They violated the posted orders, of which they had full knowledge. While ashore Chandler got a German helmet, a bayonet, a belt with machine gun bullets, 2 German flares (probably anti-personnel mines) and other items. Hand, a mess boy, also got a helmet, a bayonet and machine gun bullets.

Captain Wilson of the "Samuel Chase" made a daily inspection of the crew's quarters accompanied by the Chief Steward or the Chief Officer. The crew's lockers were examined but their personal baggage and clothes were not searched. The inspection was for sanitary purposes and to see if the crew had any dangerous weapons aboard. The flares and shells were not seen either in Chandler's or in Hand's lockers.

Chandler had been warned by McNeely, one of the Navy's armed guard, that the flares were dangerous and he was told to throw them overboard. Hand gave him the same advice. The second assistant engineer, Blumenstein, saw them in Chandler's quarters on July 28th about 1 P.M. and he told Chandler to throw them overboard. Chandler took them and left the room apparently to comply with the order, but he did not do so. He must have secreted them elsewhere, because he had them in his possession when he went into the engineroom after 5 P.M. that day while off duty.

Chandler testified that he took the flares and a belt of bullets to the engineroom after 5 P.M. because R. L. Knaggs, a fireman had asked to see them; and that while Knaggs was looking at one of the flares he told Chandler that the top was loose and handed it back to Chandler; that he (Chandler) noticed that it was making a sizzling noise so he tossed it into a rag can where it exploded. Knaggs denies this

story absolutely. He testified in a deposition that he saw Chandler enter the engineroom about 15 or 20 minutes before the explosion. Knaggs was on duty as fireman and water-tender. Chandler was at the log desk. The waste can was on Chandler's right, near the log desk, which was about 8 or 10 feet to the right of where Knaggs was standing watching the gauges. The explosion floored Knaggs and a number of particles of metal entered the right side of his body. After the explosion of the flare, some of the bullets in a machine gun belt on the side of the can went off. The lower part of the waste can was torn apart. It was about the size of an ash can and was made of corrugated steel. Knaggs got up and sounded the alarm. Some of the rags from the can had caught fire and were blown about the engineroom by the force of the explosion.

The chief engineer, the master, an assistant engineer and others hurried down into the engineroom. A crew member used a fire extinguisher to put out the burning rags. Chandler was lifted on the shoulders of one of the officers and carried up on deck. Arrangements were made promptly to take Chandler and Knaggs ashore. Knaggs was able to return to the vessel the next day. Chandler was taken to an Army field hospital where his right leg was amputated and his other injuries were treated. Later he was flown to a hospital in England. He was shipped back to the United States and entered the United States Marine Hospital at Staten Island, New York, on September 17, 1944. A second operation was performed on the stump of his right leg below the knee. His left hand was operated on. His other injuries were re-examined and he received all the medical care possible; but his left eye is totally blind, his left ankle has a partial limitation of motion and he now uses an artificial leg on the stump below the right knee.

The flare which exploded in the engineroom a little after 5 P.M. on July 28, 1944 had been obtained by libelant, Chandler, while he was ashore at the Normandy beachhead on July 22-23, 1944, contrary to orders. It was a dangerous souvenir.

He brought it aboard in the pocket of his jacket. The only officer who knew that Chandler had the flares aboard ship was the second engineer Blumenstein who, when he saw them about 1 P.M. on July 28th told Chandler to throw them overboard. Chandler left the room in the direction of the deck apparently for the purpose of complying with this order, but he did not do so.

Libelant's attorney argues that Blumenstein was negligent in not confiscating the flares and in failing to dispose of them himself. Libelant's own conduct gave Blumenstein the impression, when libelant left the room with the flares, that libelant would throw them overboard as Blumenstein had directed. In effect libelant charges that Blumenstein was guilty of negligence in believing that libelant would do what Blumenstein told him to do, and what in fact libelant pretended he would do at the time. The second engineer did not report the incident to the Master. Assuming that he should have done so for disciplinary reasons, nevertheless Chandler's apparent compliance with the second engineer's order made any report to the Master unnecessary, as a safety measure. While "negligence" is given a liberal interpretation under the Jones Act, 46 U.S. C.A. § 688 Koehler v. Presque-Isle Transp. Co., 2 Cir., 141 F.2d 490, I have not found any case that stretches the term so broadly as to have it cover a fact situation similar to that in the case at bar.

Libelant's attorney also argues that there was negligence on the part of the ship's officers either in failing to discover the flares aboard ship in the regular routine inspections of the crew's quarters made by the Captain and other officers, or in failing to confiscate them if they did know that Chandler had the flares aboard. The Captain testified that in inspecting the crew's lockers he did not open their baggage to examine their personal belongings and he did not search their clothing. The daily inspection was a routine one conducted principally for sanitary purposes, although the officers were on the watch also for any dangerous war souvenirs. The Army stevedores did some barter in war souvenirs

when aboard ship discharging cargo. There was no duty imposed on the ship's officers to examine the baggage of every member of the crew to look for dangerous war souvenirs. The crew had been sufficiently warned through posted notices against going ashore and against handling dangerous war souvenirs. The officers did their full duty in warning the crew. Testimony by libelant and Hand that the officers knew all about the dangerous German flares and did nothing, is not worthy of belief.

This is not a case where some member of the crew, who had nothing to do with getting the dangerous war souvenir, was injured by its explosion. Knaggs is not the libelant here. Chandler who violated the Master's orders and was injured through his own misconduct is asserting a claim based on what his attorney argues was negligence of the ship's officers. One of the arguments advanced on libelant's behalf is his youth.

Libelant was 17 years and 4 months at the time of the accident. But he was older and more experienced than most youths of that age. He had been pretty much on his own since he was 15 years old due to conditions in his home. His father was thrice divorced. As the child of the first marriage libelant was well cared for by his father's second wife. But she was a trained nurse and was away from home a good deal. Libelant graduated from grammer school and spent a year and a half in high school. During his high school course he lived for part of the time with relatives. He worked in a bowling alley. After leaving high school he worked in a shipyard at Bath, Maine, for 3 or 4 months. He then ran off to Florida, hitchhiking his way. In Florida he attended a welding school at a N. Y. A. Camp for 3-1/2 months. He hitchhiked back to Maine and went to work as a welder in a shipyard at Bath for 3 months. Next he worked as a welder for 2-1/2 months at South Portland, Maine. As a shipyard worker he earned $45 to $55 a week. He signed on as a messman for his first voyage on the "Samuel Chase" on February 6, 1944. The vessel made a trip to England and return. He was discharged April 30, 1944. He re-shipped on the "Samuel Chase" at New York on May 13th, as a wiper. He was asked by the gunnery officer to assist as the hot shell man, to catch the empty shell after the gun is fired. The Navy had an armed guard aboard.

Libelant was 5 feet 6 inches and weighed about 135 pounds when he was injured by the explosion of the German flare on July 28, 1944. He had always been a self-sufficient young man and had his own ideas of what he wanted to do. That may account for his disregard of the advice he received from Hand and McNeely to get rid of the flare because it was dangerous. Aboard ship libelant was a good worker and never sought any special consideration. For generations young men have gone to sea, younger and less experienced than libelant. There was no special obligation placed on the officers of the "Samuel Chase" to watch over the libelant and take care of him because of his youth.

Libelant has failed to prove that any negligence on the part of the ship's officers or crew caused his injury. On the contrary, the evidence shows that he alone caused his injuries.

Libelant is not entitled to recover on the claim for maintenance and cure. He was injured through his own misconduct, as a direct result of his deliberate infraction of the Master's orders and those of the beachmaster, by going ashore at the Normandy beachhead on July 22-23, 1944, and bringing aboard ship a German flare, a contraband article which was a dangerous weapon as well. On July 28th in the engineroom of the ship he was trying to handle the German flare for some purposes, probably to dismantle it. It began to sizzle and he threw it in a corrugated steel can used for waste rags. The flare exploded causing the libelant serious and permanent injuries. Libelant's own willful misbehavior and deliberate acts of indiscretion have deprived him of any right to recover for maintenance and cure. This principle has been applied in many decided cases. Aguilar v. Standard Oil Co., 318 U.S. 724 at pages 731, 732 and 735, 63 S.Ct. 930, 87 L.Ed. 1107; Kyriakos v. Goulandris, 2 Cir., 151 F.2d 132 at page 138; Kable v. United States, 2

Cir., 169 F.2d 90 at page 93; Barlow v. Pan Atlantic S.S. Co. 2 Cir., 101 F.2d 697 at page 698; The Bouker No. 2, 2 Cir., 241 F. 831 at page 833, footnote.

If libelant were entitled to recover for maintenance, I would allow him maintenance from November 8, 1944 when he was discharged as an inpatient at the United States Marine Hospital, Staten Island, to August 30, 1945, when he was able to sail again as a member of a crew, although handicapped by an artificial limb with which he was equipped March 20, 1945. At a rate of $5.00 a day for maintenance for 296 days, the total would have been $1,480.00. All medical care and cure were furnished at Government expense. But for the reasons hereinabove stated libelant's claim for maintenance and cure must be denied.

The libel herein which pleads two causes of action, one for damages based on negligence and the other a claim for maintenance is dismissed on the merits as to both causes of action.