## GAYNOR v. UNITED STATES et al.
### No. 77 of 1947, Admiralty.

United States District Court
E. D. Pennsylvania.
Feb. 23, 1950.

Freedman, Landy & Lorry, Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw, Philadelphia, Pa., for respondent.

KIRKPATRICK, Chief Judge.

Gaynor, the libellant, was a member of the crew of the S. S. Christopher Gadsden. On December 24, 1945, the ship having been in the harbor of Charleston, South Carolina, for about ten days following a foreign voyage, he obtained shore leave, to return on the 26th. He spent the night in Charleston and on the afternoon of December 25th took a bus out of Charleston, intending to spend the night with his brother-in-law who lived about 50 miles away. Thirty-five miles out of Charleston there was an accident and Gaynor suffered a bad fracture of his right leg.

This action for maintenance and cure, brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., was begun February 24, 1947. A month later Gaynor brought suit at law in this Court against the Bus Company and, in March, 1949, obtained a verdict of $20,000 for his injury. That suit is now pending on appeal.

I.

█ The libellant's injury having been incurred while he was on shore leave, his right to maintenance and cure is not affected by the fact that the injury did not occur in the dock area.

In Aguilar v. Standard Oil Co. of New Jersey and Waterman Steamship Corp. v. Jones, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107, the injury in each case occurred on premises which had to be traversed in going from the vessel to the public streets or returning to it from them. It is perfectly clear, however, that the locus of the accident was not a factor in the decisions. On the contrary, the definition and scope of the obligation as stated in the opinion make it clear that it exists in favor of the seaman on shore leave wherever he may be. The rationale is that service of the ship includes periods of relaxation on shore after the arduous duties of a sea voyage. The Court said, "In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings." 318 U.S. at page 734, 63 S.Ct. at page 936. The fact that the Supreme Court expressly refrained from going beyond the situation actually before it is of no moment. It would be inconsistent with the reasoning of the Aguilar decision not to do so if the occasion should arise.

II.

█ The fact that the libellant has obtained a judgment for damages arising from his injury from the Bus Company in an action based on its negligence does not bar his right to maintenance and cure.

I do not think that McCarthy v. American Eastern Corporation, 3 Cir., 175 F.2d 727, is applicable. In that case, both the action for maintenance and cure and the action for damages were against the shipowner, and at the jury trial in the damage suit the value of room and board were

proved and, at the request of the plaintiff, submitted to the jury by the judge as an element in determining loss of earnings and earning power. The situation here is entirely different, the action for damages having been against a third party. Whatever the effect of decisions in other circuits may be, the issue is foreclosed against the defendant in this circuit by the decision of the Circuit Court of Appeals in Jones v. Waterman S. S. Corporation, 155 F.2d 992.

### III.

The libellant is entitled to maintenance and cure from August 6, 1947, to the present date, with the exception of certain periods hereafter noted.

When Gaynor left the Marine Hospital on August 6, 1947, he was certainly not fit for duty, but that is unimportant if he was as nearly fit for duty as he ever could be—in other words, if the maximum cure possible had been reached and no further improvement was reasonably to be expected to result from further treatment.

■ I do not think that he was. The broken bone of his leg had been united by a bone-grafting operation in April, 1946. After prolonged hospitalization following the operation he had been discharged but thereafter suffered pain and swelling of the extremity whenever he attempted to walk even short distances, making it necessary at times for him to be completely inactive. As a result, he returned to the hospital on July 10, 1947, and remained there for about a month in bed receiving physiotherapy.

When he was discharged on August 6 the doctors felt that everything medically and surgically possible had been done for him. Apparently they thought that it was probable that nature would complete the healing process which had undoubtedly made appreciable progress after the operation. The fact proved to be otherwise. After August, 1947, Gaynor continued to have and still has the same trouble with the leg as he had had before. The condition is painful, re-

quires treatment from time to time and is completely disabling so far as any occupation which he can pursue is concerned. Further, additional surgical treatment is indicated. Another bone-graft to strengthen the union gives fair promise of restoring his leg to a condition in which he can have, if not full use of it, at least far better use than he has now.

On this state of facts I do not think the rule in Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 708, 93 L.Ed. 850, denies him maintenance and cure up to now and through the time required for another operation. In the Farrell case the important finding was that Farrell's blindness and post-traumatic convulsions were "without possibility of further cure." That being the fact, the Court held that he was not entitled to maintenance and cure for the rest of his life, it being established that the maximum cure possible had been effected, although the Court did suggest that if he received "future treatment of a curative nature" the respondent did not contend that he could not recover the amount expended for such treatment and "for maintenance while receiving it" in a new proceeding.[1]

This case is quite different. There is a definite probability of further cure—probably a complete one, except for some permanent deformity. When he left the Marine Hospital in August of 1947 the situation was either (1) that the bone-graft operation of April, 1946, would, assisted by nature and use, prove successful and effect a strong, satisfactory union which would give him the full use of his leg or (2) that it had fallen short of success, in which latter case further treatment and another operation were necessary. Time proved that the operation had not been a success and that nature unassisted would effect no further improvement. Whether the doctors who discharged him in August, 1947, should have realized this is of no importance. The doctor who discharged him said, "There eventually comes a time when you have to try to see what the edema will do * * * So

---

1. It is evident that the Court was using the word "curative" to distinguish the treatment for which the libellant could recover from the treatment which he needed from time to time to alleviate his recurring seizures.

we thought the patient had reached that stage that he had no symptoms * * * so that that time had arrived * * * We thought that the patient had received the maximum hospital benefit at that time." But he also said that if it were true that for an entire year after he left the hospital Gaynor had to use a cane and his leg was swelling up so that he could not walk more than four blocks without having pain in his leg, "the patient needed to be examined again * * * he might need any number of different forms of treatment."

 Of course, an injured seaman may not wilfully prolong for an indefinite time the shipowner's liability for his maintenance and cure. He is bound to seek treatment needed to improve his condition, to avoid aggravation of his injury and to undergo nonhazardous surgery if that offers a good prospect of a cure. I cannot convict Gaynor of default in this respect. In spite of the absence of improvement in his injured leg and the recurrence of pain and swelling when he used it, he knew that he had been discharged from the Marine Hospital as fit for duty, undoubtedly believed that everything medically possible had been done for him and was certainly justified in taking no further steps, at least for a considerable time, in reliance upon the hope that improvement would come in due time. After his discharge from the hospital he twice applied for employment on vessels and was rejected after medical examination, once at the Public Health Service Station in Philadelphia. Four or five months later he requested treatment at the Public Health Station but was refused. In August, 1948, his leg was again fractured and again he applied for treatment and was refused. He was then admitted to the Pennsylvania Hospital and after being discharged from that institution received out-patient treatment at various intervals and was furnished with a special surgical shoe and a metal leg brace, which he wore. Whether or not the officer in charge of the Public Health Station was conforming to regulations when he refused Gaynor treatment is unimportant. The point is that from August, 1947, up to the present time he was doing for himself enough to negative any default or waiver which could bar his claim for maintenance and cure.

I think that Gaynor is entitled to maintenance and cure up to the present time and, further, at least until he has had an opportunity to either accept or reject another operation. Of course, the periods when he was in various hospitals including the hospital in Walterboro between December 25, 1945, and February 10, 1946, will be eliminated.