60

W. J. & H. W. Waguespack, of New Orleans, La., for libelant.

Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., and W. B. Spencer, Jr., Asst. U. S. Atty., both of New Orleans, La., and L. V. Cooley, Jr., of Slidell, La., and W. I. Connelly, New Orleans, La., for respondent.

CAILLOUET, District Judge.

Libelant, member of the crew of the SS Polybius of the United States Shipping Board Merchant Fleet Corporation, and on shore leave therefrom at Avenmouth, England, on the night of February 16th, 1926, fell into the water between his vessel and the wharf where said vessel was docked; from said happening there developed a stiffness and numbness in the seaman's left knee and leg, which he reported to the master of the vessel and which caused him to lay up and stop work until the vessel's return to the United States through the port of New Orleans, where, on March 11, 1926, he was paid his wages in full and was furnished with a hospitalization certificate to the United States Marine Hospital; he entered said hospital for treatment on March 13th, and his condition was diagnosed as arthritis of the left knee; he remained in the institution, as patient receiving treatment all the while, until October 4, 1926, when, at his own request and because no further hospitalization was necessary, he was discharged in condition to report for duty as seaman; he married on October 26th, 1926; and secured employment on the SS Western Light, November 3rd, 1926.

Libelant alleges that all during his hospitalization and until the time of filing his libel, i.e. December 29, 1932, he suffered "physical pain and great mental pain from the contemplation of his condition", he being advised and believing that he suffered a permanent injury "in and to his said left leg and knee which will cause him trouble for the rest of his life"; that he had to forego his usual work and employment and was incapacitated for a period of one year; that "he has expended and will have to expend large sums of money on account of said accident and will also lose large sums of money in wages as a result thereof",—but none of this he attempted to prove; that he was "sick, sore, maimed and disabled and that he suffered damages as a result of all of the foregoing" in the sum of $40,000, for which he prays for judgment.

Libelant charges that his unfortunate experience resulted in no manner from his own negligence, carelessness or unskillfulness, "but was solely and entirely due and caused by the negligence, carelessness and unskillfulness" of the respondent, acting through its "agents, vice-principals, servants and employees", in that (so libelant alleges) the vessel lay about seven feet from the wharf, was not properly tied thereto because originally tied too loosely and because the lines thereafter worked looser without effort made to remedy the condition, although the night watchman on the vessel notified the second mate thereof; in that the gangway from the vessel's deck to the wharf was composed of two parts, —one, the customary gangway made fast to the vessel, and the other, an extension lashed with ropes to said gangway, and merely resting on the wharf instead of being made secure in fixed position; and, finally, in that said gangway extension was equipped with neither railing nor hand lines and, moreover, was not long enough to adequately serve its purpose.

The respondent countered by specifically alleging that the accident "was solely and exclusively proximately caused by and due to libelant's own carelessness, negligence, misconduct, unskillfulness, and his utter disregard for his own safety"; and expressly denied that such accident was due, in any manner or degree, to the fault of respondent, its vice-principals, agents, or sub-agents, nor to "fault or unseaworthiness of the vessel, its equipment, supplies, machinery, devices, etc."

A study of the testimony leaves one in no doubt that the libelant has utterly failed to sustain his allegations charging negligence to respondent. For instance, he did not even attempt to prove that the vessel was originally tied to the wharf too loosely or in any but an entirely proper manner, nor that the extension part of the gangway was unprovided with a railing or hand line; as a matter of fact, the proof, including libelant's own evidence, is to the contrary, and shows the vessel to have been originally properly docked and moored, and. the extension gangway (or wooden ladder lashed to the end of the accommodation gangway bolted to the deck) to have been equipped with a hand line and in all respects rigged safely and exactly as is the custom in shipping circles.

He, himself, testified that the composite gangway at no time broke or became loosened or disunited; it ran from the vessel's deck to the wharf and a cluster light at its head illuminated its whole length; the gangway ladder had a slight pitch or gentle slope up from the wharf, and its lower end rested, by the time of the accident, about 6 or 7 inches from the edge of the wharf; there was no way of making the gangway's lower end fast to an object or structure on the wharf; when he had gone ashore, the gangway was secure and safe but when he attempted to board the vessel it seemed as if the gangway "was giving way a little bit"—as if "the boat was taking it out"; it was possible that the vessel, by change of tide or by force of wind, was being forced back and away from the wharf; it was "kind of windy".

There was definite testimony from other witnesses, notably Third Assistant Engineer Sullivan, the Second Officer Russell, and First Assistant Engineer Zeigler, to the effect that it was raining and that there were rather heavy "squally" winds blowing offshore against the moored vessel, and that the tide had lowered several feet during the time that libelant was ashore.

Libelant further testified that when he reached the wharf, upon his return with Sullivan, Zeigler and others (which the evidence, as a whole, shows to have been at about midnight), they were warned by the watchman on deck that the gangway was not safe, but that, upon his seeing Sullivan safely run up the gangway to the vessel's deck, he, the libelant, "took a chance" but as he stepped on the extension ladder it slipped off the wharf, and he was precipitated into the water between wharf and vessel.

Sullivan's testimony is to the effect that the night watchman warned against attempting to come aboard until the ship could be "hauled" back to the wharf; that, because it was raining and "blowing heavy", he took a chance in order to reach shelter on deck; and from the deck then shouted back to those on the wharf not to attempt coming up as he had done; but libelant disregarded his warning.

Zeigler's testimony on the subject is that the ship's watchman "sung out" to be careful, that the ship was swinging out from the dock, that the gangway should be watched. "He just cautioned us to be careful about the gangway", the witness emphasized.

When libelant started his attempt to follow Sullivan, he, witness Zeigler, warned

him against it, saying "Paul, you better not try that until the gangway gets fixed", but without avail.

The boatswain Comforth, who was also in the returning party, testified that the watchman shouted from the top of the gangway "not to try to come on board as the gangway was not safe"; that Sullivan and Paul were both cautioned by himself and the others against attempting to board the vessel.

The watchman's testimony was definitely that his warning words were "Don't attempt to get on the gangway as I think it is not safe".

There is no question, in any event, that libelant was fully apprised that it was undoubtedly possible, if not certainly probable, that definite danger would attend his attempt to board the vessel, under the attendant circumstances. These circumstances were the wider intervening space between vessel and wharf, with resultant drawing back from a position of safety on the wharf to its very edge, of the lower end of the gangway, all of which libelant charges to have been brought into being, and maintained, solely, exclusively and proximately by the negligence of respondent, acting through its "agents, vice-principals, servants and employees".

Conceding, for the present purposes, that libelant was so faced by the consequences of negligence, he voluntarily exposed himself to, and assumed the risk of, such known and appreciated dangerous consequences; not only did he take no precautions whatever to avoid such ill results to himself as might reasonably have been anticipated would come to him if and when he were compelled to board the vessel in line of duty with such consequences still existent, but he deliberately flirted with the dangerous situation, and although he was otherwise in no hurry to board the vessel, was not under compulsion to return to the ship from his shore leave until eight o'clock the succeeding morning, was engaged in no service for his employer and was under no orders whatever, he elected "to take a chance," as he, himself, testified; he gambled with the known danger, lost his throw, and now seeks to have himself indemnified for his foolhardiness, if, as a matter of fact, the proximate cause of all the ills which he represents himself to have borne since the night of February 16th, 1926, until the filing of his suit on December 29, 1932, were actually found to be his fall from the gangway extension.

By his own negligence libelant brought upon himself whatever injury he suffered and he cannot be permitted, in justice, to recover damages for it. One cannot deliberately incur an obvious risk of personal injury from a dangerous situation which he charges to have been created by the negligence of another,—when he is under neither compulsion nor necessity to place himself within range of the operative influence of such situation and may rely upon preventive measures being taken to dispose of the inherent danger before he need do so,—and then be heard to contend that he should be permitted to recover from the author of the danger such damages as he sustained by reason of ensuing injury. Baltimore & Potomac R. R. Co. v. Jones, 95 U.S. 439, 24 L.Ed. 506 (1877); 38 Am. Jur. (1941) "Negligence", § 171, pp. 845-846.

The record clearly establishes that libelant received maintenance and cure; he was due that. Aguilar v. Standard Oil Co. of New Jersey (Waterman S. S. Corporation v. Jones) 318 U.S. 724, 63 S.Ct. 930 (1943). But justice demands no more.

### Findings of Fact.

The libelant voluntarily assumed the risk of the known dangerous situation that faced him at approximately midnight of February 16th, 1926, on the wharf at Avenmouth, England, and although on shore leave, free to stay away from his vessel until eight o'clock the next morning, neither in service of vessel nor under orders whatsoever, he deliberately "took a chance" to then get aboard the SS Polybius, his living quarters during the term of his seaman's service therewith; and this despite the fact that libelant well knew that he could reasonably expect proper measures to be promptly taken in order to make safer his boarding of the ship.

### Conclusions of Law.

Under such a state of facts, libelant may not legally recover "damages" for claimed injuries received by reason of his fall into the water while he so assumed the risk of said known dangerous situation, which it was his duty, on the contrary, to avoid.

A decree in accordance with the foregoing findings and conclusions will be entered.