Argued January 15, reversed and remanded July 9, 1958

# ALLAN *v.* OCEANSIDE LUMBER COMPANY
328 P. 2d 327

*Nels Peterson* argued the cause for respondent. On the briefs were Peterson & Pozzi and Gerald H. Robinson, all of Portland.

*Gunther F. Krause* argued the cause for appellant. On the briefs were Krause, Evans & Lindsay and Jack L. Kennedy, all of Portland.

Before PERRY, Chief Justice, and ROSSMAN, BRAND[*] and MCALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment, based upon a verdict, in the sum of $8,000 which the circuit court entered in favor of the plaintiff. The action out of which the judgment arose rested upon federal legislation known as the Jones Act (46 USCA 688) and averments that the plaintiff suffered a personal injury while in the defendant's employ as first assistant engineer aboard the defendant's vessel, Oceanside.

The plaintiff sustained the injury for which redress is sought November 28, 1951, at about 9:00 p. m. while the Oceanside was moored at a wharf in Crescent City, California. About three hours before his injury, the plaintiff, together with other members of the crew, had left the Oceanside and had strolled around town. About 9:00 p. m., when the plaintiff undertook to return to the ship, he jumped from the dock to the deck of the vessel and thereby sustained injury. He con-

---

[*] Resigned June 30, 1958.

tends that the proximate cause of his injury was the defendant's negligence in (1) loosely tying the ship to the dock so that it was permitted to surge as far as 60 feet from the dock; (2) failing to place a gangplank between the vessel and the dock for the purpose of ingress and egress; and (3) failing to supply adequate lighting on the vessel so that members of the crew who wished to board it at night could see the objects which affected the safety of their contemplated movement.

We mentioned the fact that the jury's general verdict was in favor of the plaintiff. In reply to special questions submitted to it, the jury found the defendant negligent in at least one of the particulars alleged in the complaint, and that such negligence proximately caused or contributed to the plaintiff's injury. It also found that the plaintiff was negligent in one or more of the particulars alleged in the answer and that his negligence contributed as a proximate cause of his injury. The answer averred:

"* * * If plaintiff was injured as alleged in his complaint, said injuries were not sustained while in the service of the ship and were caused solely by plaintiff's negligence, carelessness and recklessness in attempting to board the M/V 'Oceanside' in the dark by jumping from the dock to the deck of the vessel. * * *

"At the time plaintiff alleges that he was injured, seawatches had been set for the officers and crew of the vessel and plaintiff went ashore without permission. Because of the sea, plaintiff knew that it was not possible to keep a gangplank in place from the ship to the dock. If plaintiff went ashore, as alleged in his complaint, under the conditions then existing plaintiff departed from the service of the ship and was engaged in his own venture."

The defendant presents six assignments of error. The first to which we will now give attention follows:

"The Court erred in overruling defendant's motion for a directed verdict and in failing to give defendant's requested instruction to find a verdict for the defendant."

After two days at sea the Oceanside, which was engaged in trade between Oregon and California, entered the port of Crescent City November 27, 1951. It was moored with its bow facing out to sea and its starboard side adjacent to the dock. The ship was moored at about 5:00 p. m., and no member of the crew left it that night.

The next day the ship was drawn up tightly against the dock and the process of loading it with lumber was begun. At 4:30 p. m. the work ceased. By that time the deck of the vessel was covered with lumber except for a small area around the mooring bitt which was located at the afterend of the ship.

The port at Crescent City is an "open" or "outside" port. The quoted terms are applied to ports in which ships moored in them are affected by undertow. On account of the latter, the Oceanside was moored with its bow facing the sea so that it could leave the dock immediately if the mooring lines broke. As an additional safety measure, the officers were ordered to maintain seawatches in substantially the same manner as was done when at sea.

The plaintiff, like the other members of the crew, had not signed any articles and, therefore, could quit the ship at any time when it was in port. Usually the members of the crew, when their vessel is moored to a dock, may, at the end of the working day, go on shore leave as a matter of course. The officers who are required to maintain the seawatch are, when the

ship is moored to a dock; paid overtime for the hours spent on watch. The captain of the Oceanside testified that when seawatches are ordered no one should go ashore. However, he did not order the crew to remain on board. He claimed that he warned the plaintiff that if he went ashore he might have trouble getting back on board. The plaintiff denied that the captain had said anything on that subject to him. The captain thought he had no power to restrict shore leave. On the other hand, it was the opinion of several members of the crew that the captain could restrict shore leave when the boat was moored to a dock, but that the crew would be entitled to be paid overtime if he did so.

About 6:00 p. m., the plaintiff and Charles Roeder, another of the officers, decided to go to town. Because of the low tide they were able to step from the bridge of the ship on to the dock. The jury could have found from the evidence, which was conflicting, that the ship was still tied closely to the dock at that time. The two men did some shopping in town and had a little beer in a tavern. In the latter they saw seven or nine members of the crew, which constituted about half of the ship's complement, and then walked back to the ship. Both men were scheduled to go on duty at midnight. When the two returned to the ship they saw that the latter was no longer tied tightly to the dock, but was drifting in and out with the undertow. It would drift out from 20 to 60 feet, draw the lines taut and then come back against the fender logs.

After the day's loading operations had closed, the lines had been loosened and the breast line removed to allow the ship to respond to the tide and the undertow. During the day the breast lines which had held the ship tightly to the dock had been continuously serviced and reinforced to prevent them from breaking.

Likewise, during the day as the tide changed it was necessary to adjust the lines in order to keep them from snapping as the tide dropped or the vessel moved under pressure of the undertow. The evidence indicated that members of the crew would have had to perform tasks of the kind just mentioned during the night if the ship had remained tied tightly to the dock or if a gangplank or gangway were maintained. Although there was conflicting evidence as to whether the gangway was used at all during the time the ship was in Crescent City, it was undisputed that it was not out when the plaintiff returned to the ship. Although the first mate was on duty, no one was on deck. Neither the plaintiff nor Mr. Roeder called from the dock for aid. The night was drizzly and a single light shown from the mast with just enough illumination to reveal the mooring lines. The tide was high and the bridge was too far above the dock for the plaintiff to board the vessel by the same means which he employed when he left it.

The plaintiff noticed that a part of the deck in the afterend of the starboard side was clear of lumber. After making that observation he crouched at the edge of the dock and waited for the ship to swing in toward him, with the intention of jumping into the clear area. As the vessel neared the dock, shadows concealed the part of the deck upon which he intended to leap and therefore he failed to notice the iron bitt which was there. When the ship came within 15 inches to two feet of the dock the plaintiff jumped to its deck—five or six feet lower. In landing, one of his knees struck the mooring bitt, with the result that the plaintiff was thrown upon his back and sustained injury.

The defendant's first assignment of error to which we will now give attention is that the circuit court

erred in failing to direct a verdict for it. In its support, the defendant argues that alleged negligence of the plaintiff, mentioned in a preceding paragraph, was, as a matter of law, the sole proximate cause of the injuries.

■ The substantive rights of both the plaintiff and the defendant are governed, as is conceded, by federal law. *Greenhaw v. Pacific-Atlantic SS Co.*, 190 Or 182, 224 P2d 918.

We will now take note of statutes and cases involving employer negligence and employee contributory negligence that disclose the principles of law applicable to the issues before us. Section 688 of 46 USCA provides, in part:

> "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply;
> *  *  *."

That section incorporates into the maritime law the Federal Employers' Liability Act, 45 USCA, §§ 51-60, and 46 USCA, § 688, historical note.

■ In general, 45 USCA, § 51, establishes the liability of every common carrier by railroad engaging in interstate commerce for injuries to employees "resulting in whole or in part" from its negligence.

> Section 53 of Title 45 provides that
> "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee:  *  *  *."

As was said in *Greenhaw v. Pacific-Atlantic SS Co.*, supra:

> "* * * Contributory negligence is not a defense in cases under the Jones Act. *Socony-Vacuum Oil Co. v. Smith*, 305 U. S. 424, 83 L. Ed. 265. But the doctrine of comparative negligence obtains. Beadle v. Spencer, 298 U. S. 124, 80 L. Ed. 1082. Contributory negligence on the part of an injured workman may be relied on in diminution of damages, notwithstanding contributory negligence has not been specially pleaded by the defendant."

Section 54 of Title 45 provides, in part, that the employee

> "shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents or employees of such carrier; * * *."

In *Tiller v. Atlantic Coast Line R. Co.*, 318 US 54, 63 S Ct 444, 87 L Ed 610, 143 ALR 967, the decedent, a railway policeman, was standing between two tracks sufficiently far removed from each that he had three feet, seven and one-half inches, of standing space when trains were moving on both tracks. Decedent was inspecting the seals on cars of a train moving in one direction when he was hit and killed by the rear car of a train backing in the opposite direction on the parallel track. The rear of the train that hit him was unlighted, although a brakeman, with a lantern, was riding on the back step on the side away from the decedent. The complaint alleged that the defendant was negligent in the operation of the car which struck the deceased and in failing to provide a reasonably safe place in which he could work. The defendant denied negligence, pleaded contributory negligence and set up as a separate defense that the deceased had

assumed all the risks "normally and necessarily incident to his employment." After the plaintiff had rested, the defendant moved for a directed verdict on the grounds that (a) the evidence disclosed no actionable negligence, and (b) the cause of death was speculative and conjectural. The motion was granted and judgment entered for the defendant. The Circuit Court of Appeals, interpreting the decision of the district court as resting on a conclusion that the evidence showed no negligence, affirmed (128 F2d 420). The result was based on a holding that the deceased had assumed the risk of his position and that, therefore, no duty was owed to him by the respondent. The Supreme Court reversed. Mr. Justice Black, for the majority, said:

"The Circuit Court distinguished between assumption of risk as a defense by employers against the consequence of their own negligence, and assumption of risk as negating any conclusion that negligence existed at all. * * *

"We find it unnecessary to consider whether there is any merit in such a conceptual distinction between aspects of assumption of risk which seem functionally so identical and hence we need not pause over the cases cited by the court below, all decided before the 1939 amendment, which treat assumption of risk sometimes as a defense to negligence, sometimes as the equivalent of non-negligence. We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence.'

* * *

"* * * The theory that a servant is completely barred from recovery for injury resulting from his master's negligence, which legislatures

have sought to eliminate in all its various forms of contributory negligence, the fellow servant rule, and assumption of risk, must not, contrary to the will of Congress, be allowed recrudescence under any other label in the common law lexicon. The Act of 1908 and the amendment of 1939 abolish the post-Priestley v. Fowler, 7 Mees & W. 1, 150 Eng Reprint 1030, 19 Eng Rul Cas 102, defenses and authorize comparison of negligence instead of barring the employee from all recovery because of contributory negligence. They leave for practical purposes only the question of whether the carrier was negligent and whether that negligence was the proximate cause of the injury."

Mr. Justice Frankfurter, in a concurring opinion, said:

"\* \* \* Thus, in the setting of one set of circumstances, 'assumption of risk' has been used as a shorthand way of saying that although an employer may have violated the duty of care which he owed his employee, he could nevertheless escape liability for damages resulting from his negligence if the employee, by accepting or continuing in the employment with 'notice' of such negligence, 'assumed the risk.' In such situations 'assumption of risk' is a defense which enables a negligent employer to defeat recovery against him. In the setting of a totally different set of circumstances, 'assumption of risk' has a totally different meaning. Industrial enterprise entails, for all those engaged in it, certain hazards to life and limb which no amount of care on the part of the employer can avoid. In denying recovery to an employee injured as a result of exposure to such a hazard, where the employer has in no sense been negligent or derelict in the duty owed to his employees, courts have often said that the employee 'assumed the risk.' Here the phrase 'assumption of risk' is used simply to convey the idea that the employer was not at fault and therefore not liable.

\* \* \*

"* * * The basis of an action under the Act remains the carrier's negligence. The carrier is not to be relieved from the consequences of its negligence by any claim that the employee 'assumed the risk' of its negligence. But neither is the carrier to be charged with those injuries which result from the 'usual risks' incident to employment on railroads—risks which cannot be eliminated through the carrier's exercise of reasonable care.

" 'Assumption of risk' as a defense where there is negligence has been written out of the Act. But 'assumption of risk,' in the sense that the employer is not liable for those risks which it could not avoid in the observance of its duty of care, has not been written out of the law. Because of its ambiguity the phrase 'assumption of risk' is a hazardous legal tool. As a means of instructing a jury, it is bound to create confusion. It should therefore be discarded. * * *

"* * * But since I agree that the District Court should have allowed the case to go to the jury on the issue of negligence, I concur in the decision."

Mr. Justice Frankfurter's concurring opinion was quoted and applied in *Roberts v. United Fisheries Co.*, 141 F2d 288, cert den 323 US 753, 65 S Ct 81, 892 L Ed 603, which was a case that arose under the Jones Act.

In *Rogers v. Missouri Pacific R. Co.*, 352 US 500, 77 S Ct 443, 1 L Ed2d 493, Mr. Justice Brennan, for the majority of the court, said:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. * * *

"* * * The decisions of this Court after the 1939 amendments teach that the Congress vested

the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury."

In *Ferguson v. Moore-McCormick Lines, Inc.*, 352 US 521, 77 S Ct 457, 1 L Ed2d 511, the plaintiff brought an action under the Jones Act for injuries sustained when, as a second baker aboard defendant's ship, he was ordered to prepare twelve servings of ice cream. The ice cream was hard and could not be removed with the hemispherical scoop with which the plaintiff had been furnished. He thereupon resorted to a sharp butcher knife with which he began to chip away at the ice cream, but the knife struck a hard spot and the plaintiff received a cut which resulted in the loss of two fingers. He claimed that the defendant was negligent in failing to provide a proper tool. The Court of Appeals reversed a judgement entered upon a verdict for the plaintiff. It found that it was "not within the realm of reasonable foreseeability that petitioner would use the knife to chip the frozen ice cream." The Supreme Court reversed. Mr. Justice Douglas, for the majority of four, found that a case for the jury had been presented under the rules stated in the Rogers case.

In light of the above cases, would a holding that the plaintiff's alleged contributory negligence was as a matter of law the sole proximate cause of his injuries constitute an attempt to do that which Mr. Justice Black warned against, namely, a resuscitation of the defenses of contributory negligence and assumption of risk under another label in the common-law lexicon? If the defendant was negligent in one of the particulars alleged under the federal law, fair-

minded men could find that such negligence played a part in the plaintiff's injury. 45 USCA § 51, note 1244, and cases cited therein.

> "Where it appears how an accident happened and also that the victim might have saved himself by taking advantage of a precaution which it has been shown defendant negligently failed to afford courts have generally let a jury find the failure caused the harm  *   *   *."

Harper and James, The Law of Torts, § 202, p 1113.

In *Jackson v. Pittsburgh SS Co.*, 131 F2d 668, the plaintiff was a member of the crew of a steamship which was tied to a dock in Toledo, Ohio. He wanted to go ashore after coming off watch and went to the forward part of the main deck to descend a ladder to the dock. No ladder was available nor any other means of egress from the vessel. He requested a member of the crew to place a ladder over the side of the vessel so that he could go ashore. His request was refused. He thereupon jumped from the deck of the vessel to the dock, a distance of about six feet, and received injuries. The district court dismissed his action as failing to state a justiciable claim. The circuit court affirmed, saying:

> "When a seaman, by his own volition, creates an extraneous circumstance, he brings about an intervening cause that directly affects his relation to his employers and to the ship. He is responsible for such intervening cause if it consists of his own wilful misconduct, is something which is done in pursuance of some private avocation or business or grows out of relations unconnected with the service or is not the logical incident of duty in the service.
> "*   *   * The only expectable injury that he might have suffered from the failure to provide a

ladder would have been some inconvenience or delay in leaving the vessel. This could readily have been avoided or minimized either by putting the ladder in place himself or in requesting someone in authority to direct that it be done. When he leaped from the ship under circumstances where injury might reasonably be expected to result he acted on his own volition in the pursuit of his personal affairs, and was not injured in the service of the ship."

That case is distinguishable from the one at bar. In it the court found that the resulting harm was not an expectable risk of the failure to provide a ladder. It also found that the plaintiff could have minimized or avoided the expectable injury of inconvenience or delay in leaving the vessel by either putting the ladder in place himself or in requesting someone in authority to direct that it be done. Finally, the court found that a seaman going on shore leave was engaged in his personal affairs. In the present case, the jury could have found, and evidently did, that it was reasonably foreseeable that the plaintiff and other members of the crew would attempt to gain ingress to the vessel by jumping in the manner that was done, and that the failure to exercise reasonable care for the safety of the crew in the face of the foreseeable danger was that which made the defendant negligent. 2 Restatement, Torts, §§ 447 and 449.

In respect to the second distinguishing characteristic, the jury might have found that in the present case there was no other way for the plaintiff to get on board the ship. As to the third point, the plaintiff in the present case was returning to the vessel in order to go on duty. Furthermore, the Jackson case was decided before *Anguila v. Standard Oil Company of New*

*Jersey,* 318 US 724, 63 S Ct 930, 87 L Ed 1107, in which the court said:

> "In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion."

The second case relied upon by the defendant is *Paul v. United States,* 54 F Supp 60, which was an action in admiralty and sought damages for injuries sustained by the plaintiff when he attempted to board his ship with the aid of a gangway that was not secured to the dock. The court could have found that the plaintiff had been warned by the watchman that the gangway was unsafe. The court, in rendering a decree for the defendant, said:

> "Conceding for the present purposes that libelant was faced by the consequences of negligence, he voluntarily exposed himself to and assumed the risk of, such known and appreciated dangerous consequences."

Since the Tiller case the reason given by the court for its decision is, as was said in *Roberts v. United Fisheries Co.,* supra, " 'absolutely' out of the window." The decision may rest, however, on the ground that the defendant exercised reasonable care.

The third case relied on by the defendant is *Meintsma v. United States,* 164 F2d 976, in which the plaintiff sued in admiralty for injuries sustained when he jumped from the lower end of the gangway, which was three feet from the dock, on to the dock. The lower court dismissed the libel. The Court of Appeals affirmed, quoting the lower court's finding that the libelant negligently failed to make request of an officer or fellow crew member to have the gangplank lowered so that it would come in actual contact with the surface of the dock. The case is distinguishable

in that the lower court—the case being in admiralty—exercised its function in finding that the defendant's alleged negligence was not a direct and proximate cause of the plaintiff's injuries.

In the following cases, the plaintiff had a recovery although he jumped from the gangway or from the dock. *Broussard v. United States,* 1956 AMC 882 (jump from gangway six feet above water into a bumboat); *Tate v. C. G. Willis, Inc.,* 154 F Supp 402 (jump from dock to deck of barge. The court distinguished the Jackson and Meintsma cases).

The rule for which the defendant argues was best stated in *In re Michigan SS Co.,* 133 F 577:

> "Negligence cannot ordinarily be said to be the proximate cause of an injury when the negligence of another independent human agency has intervened and directly inflicted the injury."

See, generally, Carpenter, Proximate Cause, 15 So Calif L Rev 304; Eldredge, Culpable Intervention as Superseding Cause, 86 U of Pa L Rev 121.

The following is from 2 Harper and James, The Law of Torts, § 20.5, p 1144:

> "* * * If the likelihood of the intervening act was one of the hazards that made defendant's conduct negligent—that is, if it was sufficiently foreseeable to have this effect—then defendant will generally be liable for the consequences * * *
> "So far as scope of duty (or, as some courts put it, the relation of proximate cause) is concerned it should make no difference whether the intervening actor is negligent * * *.
> "* * * Again the importance of the factor of foreseeability is not altered if the intervening act is that of plaintiff himself, nor is it if that act is a negligent one. * * * If he is barred from recovery from such hurt it is because of his con-

tributory fault, not for want of a causal connection or because he is beyond the scope of my duty."

Whether the rule stated in *In re Michigan SS Co.,* supra was ever an accurate statement of law, *Ferguson v. Moore-McCormick Lines, Inc.,* supra, and *Palermo v. Luckenback SS Co.,* 78 S Ct 2, 2 L Ed 22, indicate that it is not the law in cases arising under the Jones Act.

■ The lower court was correct in refusing to direct a verdict for the defendant.

■ It is the defendant's contention, in its second assignment of error, that the court erred in concluding as a matter of law that if the defendant failed to provide a reasonably safe means of ingress and egress to the vessel, such conduct would be negligence. The defendant objected to the following instruction:

> "You are instructed that a shipowner has a positive, absolute and non-delegable duty to provide at all times for the use of the crew members a reasonably safe means of ingress and egress from the vessel while the vessel is moored at a dock when it is necessary for members of the crew to come aboard and leave the vessel. In this case, if you find the defendant failed to provide a reasonably safe means of ingress and egress to the vessel as pleaded in the plaintiff's complaint, then the defendant would be guilty of negligence."

The defendant had a duty to see to the safety of the crew to the extent that such safety could be provided for by the exercise of reasonable care. *Koehler v. Presque Isle Transportation Co.,* 141 F2d 490, cert den 322 US 764, 64 S Ct 1288, 88 L Ed 1591; *Vojkavich v. Ursich,* 49 Cal App2d 268, 121 P2d 803.

■ In the ordinary case, when a vessel is tied to a dock and the crew is permitted shore leave, the cir-

cumstances may be such that all reasonable men would find that it was reasonably foreseeable that the crew would use the available means for ingress and egress created by the inviting proximity of the dock to the ship and that, in the exercise of reasonable care, a reasonably safe means of ingress and egress could have been provided. In such a case there is a duty to provide a reasonably safe means of ingress and egress, the breach of which establishes an action for negligence under the Jones Act. *Tate v. C. G. Willis, Inc.,* 154 F Supp 402.

■ In the present case, the crux of the defendant's defense was that a reasonably safe means of ingress and egress could not have been provided in the exercise of reasonable care. The evidence supporting the negative of that proposition was not so strong that all reasonable men would find that, with the exercise of reasonable care, a reasonably safe means of ingress and egress would have been provided. The issue was for the jury.

The court, therefore, committed reversible error when it, in effect, took that issue from the jury and left it the undisputed question of whether a reasonably safe means of ingress and egress had in fact been provided.

■ The defendant's third assignment of error contends that the court erred in failing to give the following requested instruction:

"If you find from the evidence that at the time plaintiff attempted to board the vessel conditions were such that a gangplank or gangway could not be maintained in position between the vessel and the dock, I instruct you that defendant was not negligent in failing to have a gangplank or gangway in place."

If, in the usual circumstances, a gangway or gangplank would normally be required, and the defendant is negligently responsible for conditions that prevent a gangway from being maintained, it may properly be charged with negligence in failing to maintain one. There was, therefore, no error in refusing the instruction, there being no provision in it for the above case.

The fourth assignment of erorr is based upon a tendered instruction concerning the absence of a gangplank, which the defendant phrased but which the trial judge declined to give. Preceding paragraphs of this opinion state our views of the law pertaining to the situation embraced in this requested instruction. This assignment of error, in our opinion, is without merit.

■ The question presented by the defendant's fifth assignment of error is whether the ruling of the circuit court was proper which overruled the defendant's objections to the admission in evidence of a document, tendered by the plaintiff, and entitled Abstract of Clinical Record. The plaintiff offered that paper as proof that, as alleged in the complaint, he had sustained a fracture of his fourth coccygeal segment. The document consisted of nine short typewritten entries upon a printed form bearing the above heading and followed by a signature and a seal. The form, according to an imprint upon it, was prepared by the Federal Security Agency—Public Health Service. The seal at the bottom of the paper was that of the United States Public Health Service. The signature was identified by accompanying typewriting as that of Daniel Rose, Medical Officer Deputy. The paper provides space after twelve headings for the entry of pertinent information. In that way the plaintiff's name and address were inserted in the form. There was also inserted after the heading "Outpatient care fur-

nished from" this data: "12-3-51 to 12-28-51." Presently there occurs this heading: "8. History Summary including patient's statement as to how and when disability occurred." Then came this typewritten statement: "Patient states he fell aboard vessel 11-28-51, injuring his spine and tail bone, left knee and leg." The ninth heading reads as follows: "9. Examination Summary including pertinent laboratory data and X-ray findings." The heading was succeeded by this entry: "Fracture contusion of coccyx. Fracture of 4th coccygeal segment."

We believe that the above mentions everything contained in the paper which the plaintiff believes is important to him. Although the ninth heading indicates that a laboratory and X-rays were employed in the examination or treatment of the plaintiff, no X-ray photographs were attached to the document. The latter was prepared about one year after the examination took place. Mr. Daniel Rose, whose signature appears at the end of the paper, did not attend the trial and his deposition was not taken. It does not appear whether or not he was familiar with the plaintiff's case. Likewise, it does not appear whether or not he is a member of the medical profession. No one who prepared the paper or participated in the medical examination or treatment of the plaintiff gave any testimony or divulged his identity. The record contains no explanation as to how the "abstract" was compiled from the "clinical record" or who made it. Likewise, it does not indicate what information is contained in the "clinical record" or where the latter is kept.

It is clear that the plaintiff presented the above document to establish that he received "Fracture contusion of coccyx. Fracture of 4th coccygeal segment." It is likewise clear that the document was received

in evidence as proof that the plaintiff had received the injuries avowed by the two quoted statements. It will be observed that the paper was handled in such a manner that the defendant was afforded no opportunity whatever to examine its author as to his knowledge concerning its contents or his familiarity with the plaintiff's condition.

If the document is admissible, it must be under one of the exceptions to the hearsay rule authorized by the laws of this state. *Chesapeake & O. R. Co. v. Kelly,* 241 US 485, 36 S Ct 630, 60 L Ed 1117; *Showalter v. Western Pacific R. Co.,* 16 Cal2d 460, 106 P2d 895.

The Oregon Uniform Business Records Act (ORS 41.690) provides:

> "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

The act, condition or event of which the abstract was a record was the diagnosis of fracture. The abstract, however, was prepared one year after the examination and diagnosis. It was not prepared "at or near the time of the act, condition or event." Furthermore, the condition that "the custodian or other qualified witness" testify to its identity and mode of preparation was not met.

■ The abstract is therefore not admissible under the Uniform Business Records Act exception.

Is the abstract admissible under the provisions of ORS 43.370?

> "Entries in public or other official books or records, made by a public officer of this state or the United States in the performance of his duty or by another person in the performance of a duty specially enjoined by the law of either, are primary evidence of the facts stated."

Under the exception to the hearsay rule just quoted, it is usually required that the officer either have personal knowledge of the facts of which he is under the duty to make a record or that he have the duty of ascertaining the truth of that which he does not know of his personal knowledge. Wigmore on Evidence, 3d Ed, § 1635, p 531. There is no reason to believe that the officer who prepared the abstract had personal knowledge of the facts recorded, nor does it appear that he had the duty of ascertaining their truth. For those reasons the abstract was not admissible under the Official Statements exception.

Is the abstract admissible as a copy under the provisions of ORS 43.430?

> "At any trial or hearing before any court, tribunal, board, commission, official body or public officer, there shall be admitted in evidence, equally with the original, a copy of any book, record, paper or other document, in any of the executive departments of the United States, * * *."

Assuming that the original medical record would be admissible under the Official Statements exception, or, if the prerequisites were met under the Uniform Business Records exception (see *Allan v. St. Louis Public Service Co.*, 365 Mo 677, 285 SW2d 663; *New York Life Insurance Co. v. Taylor*, 147 F2d 297, footnote 5; McCormick, Law of Evidence, p 612), we

do not believe that in the present case the abstract is admissible as a copy. It is more accurately described as a summary. Although a case may arise in which it is necessary to prove a fact, for which purpose the abstract may be considered sufficiently complete, we do not believe that the present case is within that category.

The plaintiff cites *Fitze v. American-Hawaiian SS Co.*, 167 Or 439, 117 P2d 825, in which a document, similar to the one now under consideration, received attention. In that case, a seaman who claimed that he had received an injury brought with him to his trial the certificate which the United States Public Health Service had issued to him, upon his request. While he, as a witness, was describing his injuries, defendant's counsel demanded and received permission to see the certificate. Later, while conducting his cross-examination of the plaintiff, defendant's counsel made use of the certificate and then offered it in evidence. The jury's verdict was for the plaintiff, but the resulting judgment was vacated and a new trial was ordered. The plaintiff appealed. Our re-examination of the record discloses that, upon appeal, no one claimed that error occurred in the circuit court when the certificate was received in evidence. Quite the contrary, the plaintiff used the certificate himself in his efforts to show that no error occurred.

We are satisfied that the fifth assignment of error discloses merit. The document was not admissible in evidence.

As for defendant's sixth assignment of error, we find the court correctly submitted the three specifications of negligence.

Judgment for the plaintiff reversed. Remanded.