**8**

Frank HOWARD, Libellant,

v.

**A. L. BURBANK AND COMPANY, Ltd.,**
in personam, Respondent.
No. 7871.

United States District Court
E. D. Virginia,
Norfolk Division.
Nov. 14, 1958.

Sidney H. Kelsey, Norfolk, Va., for libellant.

John P. Harper, Norfolk, Va., for respondent.

WALTER E. HOFFMAN, District Judge.

In a proceeding under the Jones Act, 46 U.S.C.A. § 688 et sequi, libellant seeks a recovery for personal injuries and maintenance; the injuries having been sustained on August 16, 1957, when libellant fell from his upper bunk of the SS MALDEN VICTORY while the vessel was at Izmar, Turkey.

When libellant signed aboard the vessel at Norfolk as an oiler, he was assigned to the upper bunk of the port side foc'castle, aft in the midship housing. The upper and lower bunks were attached to the side of the vessel in such a manner that a porthole with a deadlight opened directly into and, when open, immediately over the upper bunk. The dead-

light, when open, hung by its chain at a place approximately above the lower region of libellant's chest area and at a point 11 inches from the ceiling. When closed, the deadlight was only approximately 4 inches higher than the springs of the bunk and, making allowance for a mattress, would be about level with the top of same. The distance between the open deadlight and the top of the mattress was approximately 15 inches. In this space the libellant's body would lie when sleeping. Each bunk is equipped with a guard or safety rail extending from a place near the head of the bed toward the foot of the bed, a distance of perhaps 2½ feet. The purpose of such a rail is twofold; it tends to prevent the occupant from rolling out of bed, and also furnishes some assistance in getting in and out of the bunk. Seamen using these bunks will frequently reverse the safety rail by turning the bed over, the chief reason assigned for such action being that a seaman will roll against the rail thereby causing him to awake.

The experts agree that seamen must constantly be told to place their bunks with the safety rail in its proper position. Respondent's expert described the bunk conditions as seaworthy "except that the safety rail is down". With the guard rail in an upright position on this particular upper bunk, accessibility to the latter was limited and especially difficult with the open deadlight hanging only a few inches higher. A weekly inspection of the crew's quarters by the master is essentially mandatory, and more frequent inspections are made by other officer personnel.

To rearrange the bunks and place them in a different position would require moving the wash basin and putting the bunks against the forward bulkhead. This would not be such a structural change as would necessitate the approval of the Maritime Commission. While there would be some change in piping, it is a job which could be accomplished by crew personnel and would not call for servicing at a shipyard.

On the day of the accident libellant states that he was on duty from 8 A.M. to 4 P.M. and did not go ashore as the ship was in the stream. Following his dinner at 5 P.M., libellant testified that he went to his bunk to rest as it was very hot. He does not recall exactly when he dropped off to sleep, but states that he awakened in a "groggy" condition when it was dark, being then in need of using the toilet facilities. He claims to have hit his head against the deadlight and thereafter fell to the floor breaking seven ribs on his left side. He was sent to a hospital, taped up, subsequently returned to the vessel, and was off duty until the vessel landed at Norfolk on September 1, 1957. He admits that he made no effort to switch on the bedlight, or reading light, immediately above his head, and his explanation for his failure to do so is rather unsatisfactory, it being his original contention that the light would disturb the man in the lower bunk. From the pictures of the room, the exact contrary would appear to be the case although it is recognized that any ray of light may disturb another occupant of the same room. Libellant finally stated on cross-examination that he was "confused" when he awakened and did not think of the light.

The master of the vessel related his difficulties with libellant with respect to intoxication at a prior port of call, and further testified that at approximately 5:30 P.M. on the day of the accident libellant returned to the ship in a drunken condition after having been ashore. Libellant contends that he did not go ashore on the day of the accident, and at first denied having been intoxicated at the prior port of call. The demeanor of libellant while testifying leads to the belief that he had been drinking on the day of the accident and the court so finds.

Such a finding does not foreclose libellant's right to recover for injuries received as a result of an unseaworthy condition, although it may tend to mitigate the aggregate award. Sea-

men, as well as others, are inclined to imbibe intoxicants, sometimes to an excess. Respondent urges that intoxication was the *cause* of the injury. The testimony reveals, however, that the master was aware of the location of the deadlight when open, and that he had previously noted the libellant's bunk reversed with the safety rail down. On this point the master said:

"Well, I did observe that that bunk, that particular bunk, Howard's bunk, the bunk itself had been turned upside down. Now, I don't have anything to say about when a crew member prefers to have his bunk upside down. I assume that he did—that he turned this upside down himself. It wasn't installed that way."

Disagreeing with the master, it is apparent that the safety rail on these bunks exists for a purpose—a purpose that ceases to exist when the bunk is reversed. If the master permits the destruction of that purpose, an unseaworthy condition may well result in an injury. Intoxicated or otherwise, libellant's fall may, and probably would, have been avoided if the safety rail had been in proper place. It is not unreasonable to assume that the proximity of the deadlight to the bunk was the underlying reason for reversing the upper bunk. Whether libellant or a prior occupant reversed the bunk is immaterial. Libellant had knowledge of this condition as did the master, but at no time did the master ever suggest that the condition should be corrected.

When the MALDEN VICTORY arrived in Norfolk, the crew was paid off and the vessel laid up. The United States Public Health Service Hospital treated libellant as an outpatient and, on September 24, 1957, recorded that he would be fit for duty on October 1, 1957. On the latter date, libellant registered at the Union Hall but, due largely to the scarcity of ships, he did not return to work until February 20, 1958. During the interim period libellant was examined on several occasions by Dr. Duncan, an outstanding orthopaedic surgeon, who stated that there was no permanent injury, all ribs being in good condition. Some tenderness existed as of December 9, 1957, which prevented libellant from doing any heavy lifting, although light work was at that time possible. It was not until February 1, 1958, in the opinion of Doctor Duncan, that libellant could be restored to regular duty without restriction.

Libellant's basic wage was $353.27 per month; his overtime averaged $133.12 per month—a total of $486.39. He asks for loss of wages from September 3, 1957 (the date of payoff of crew) until February 1, 1958. The fallacy of this contention is that there is no showing that disability resulted in the loss of wages for a period longer than one month. Nor is there any suggestion that he endeavored to secure any light work. All signs point to the fact that the scarcity of available ships brought about the reduction in earnings. Accordingly, the loss of wages is fixed at $486.39 for one month.

The question of maintenance presents a different problem. Libellant is entitled to maintenance at $8.00 per day, in accordance with the union contract, until such time as he reached his maximum recovery. The weight of the evidence is to the effect that libellant should receive maintenance through January 31, 1958, which is the date on which he attained his maximum cure. He has heretofore been paid maintenance through October 1, 1957. A recovery for maintenance and cure is not subject to deduction for contributory negligence. Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107.

The injuries, while painful, were not serious. Evaluating the pain and suffering, the Court is of the opinion that, absent any contributory negligence, libellant would be entitled to an award of $3,000.00 for his injuries. To this amount should be added $486.39 for one month's loss of wages. The aggregate of these items should be reduced by

one-third for the contributory negligence of libellant as suggested herein, namely, his condition from the standpoint of sobriety, his failure to turn on his reading lamp, and his actions in permitting the bunk to remain in a position where the safety rail was ineffective. Maintenance, without deduction for contributory negligence, shall be paid for the period beginning October 2, 1957, to and including January 31, 1958.

Proctors for libellant will prepare a decree in accordance with this memorandum which pursuant to General Admiralty Rule 46½, 28 U.S.C.A., is adopted by the Court in lieu of specific findings of fact and conclusions of law and, after presentation to proctors for respondents for inspection and endorsement, shall transmit the same to the Court for entry.