Harry E. McCoy, Seawell, McCoy, Winston & Dalton, Norfolk, Va., for respondents.

**Charles PRENDIS, Libellant,**

v.

**CENTRAL GULF STEAMSHIP COMPANY, in personam, and Steamship THE GREEN HARBOUR, her tackle, etc., in rem, Respondents.**

**No. 7844.**

United States District Court
E. D. Virginia,
Norfolk Division.

Jan. 30, 1962.

WALTER E. HOFFMAN, Chief Judge.

On June 19, 1957, libellant instituted this action alleging (1) a claim for damages for personal injuries allegedly sustained when libellant endeavored to descend from the upper bunk in his forecastle, which bunk was not equipped with a ladder, and was allegedly caused to fall by reason of the insecurity of a wooden bench provided therein; (2) a claim for maintenance; (3) a claim for wages to the end of a foreign voyage; (4) a claim for medical expenses.

Libellant, a seaman approximately 31 years of age at the time of the alleged accident, initially signed aboard the vessel at Newport News, Virginia, on February 1, 1957, as an oiler. He was assigned to quarters with a fireman who occupied the lower bunk. The foreign voyage ended at New Orleans on March 28; the crew was paid off; and arrangements made for another foreign voyage. On March 29, libellant signed foreign articles for the contemplated voyage but, on the same day, advised the first mate that he was having trouble with an eye condition which had existed for several years and was desirous of going to the hospital. Upon reporting to the hospital he was advised that he had a growth upon his right eye which should be removed. A resident of Highland Springs, Virginia, which is located near Richmond, libellant elected to be treated at the Veterans' Administration Hospital in that area. The initial and ultimate diagnosis of his

eye condition was chronic conjunctivitis with formation of some whitish exudate.

When advised that the growth should be removed, libellant returned to the vessel. He testified that he visited the opthalmologist in New Orleans at 3:30 P.M. on April 1, 1957. Presumably he continued working after being given permission to visit the hospital on March 29; in any event he was paid his wages during the interim period. Following his visit to the hospital, he returned to the vessel and reported to the mate that he would have to leave the vessel.

Libellant stated that he returned to his quarters after supper that evening for the purpose of resting. According to custom, he stepped on the bench, grabbed the railings, and hoisted himself into the upper bunk. At approximately 9:45 P.M. on April 1, 1957, he awakened, switched the light on, lowered himself from the bunk and, when he went to step on the bench, he fell when the bench toppled over. He contends that he struck the left side of his face and injured his neck and shoulder.

The following day libellant made arrangements to be paid off and went to the office of the Shipping Commissioner for that purpose. He flew to Richmond via Eastern Air Lines that afternoon, and reported to the Veterans' Administration Hospital on April 3.

There were no witnesses to the alleged fall from the upper bunk. The evidence is in hopeless conflict as to whether such an alleged accident was ever reported by libellant. The log books reveal only that libellant was granted leave to visit the hospital at New Orleans on March 29. The various ship's officers and the Shipping Commissioner deny that libellant reported any such accident. The testimony rather forcibly demonstrates that libellant had been partaking of some form of intoxicants on April 2, the extent of his intoxication being a matter of serious debate but, in any event, he was still able to walk unaided.

When called upon to state the parties to whom the accident had been reported, libellant advised that the injuries had been reported by libellant to the chief engineer, chief mate and to the master in the presence of the Shipping Commissioner. We are, therefore, required to determine the credibility of libellant's statement as to the reporting of his accidental fall. Libellant does not contend that the accident was unreported due to the shortness of time in leaving the vessel, going to the office of the Shipping Commissioner, and flying to Richmond by airplane leaving New Orleans at 3:10 P.M. He states that, following his fall from the bunk, he went ashore to make a telephone call. It was approximately four blocks to the telephone, which distance he walked; the pain struck him about fifteen minutes after falling; it became more severe and, after completing his call, he returned to the ship in a taxi. He admits that he did not report the accident to the night mate on duty, but went directly to his bunk. At 7 A.M. the next day, libellant testified that he told the chief engineer of his accident; a statement that is emphatically denied by the chief engineer. Libellant then said that he told the chief mate of his injuries; which statement is similarly denied. In support of his contention libellant produced a wiper, Navas, who joined the ship with libellant and who had been acquainted with him for about three years. Noting the inconsistencies in the evidence, Navas testified on direct examination:

"Q. Do you know anything about Mr. Prendis being injured on the ship?

"A. I saw him with the face, that left side here (indicating). I did not see when he fall down, but I saw it when I had to help him to go to see the chief mate.

\*    \*    \*    \*    \*    \*

"Q. You say you helped him go to the mate?

"A. That's right, when he got hurt I get off of watch and I helped him to go to the chief mate.

"Q. And when you went to the chief mate what transpired; what happened between the chief mate and

Mr. Prendis that you were a witness to.

"A. Well, I just helped him. I don't know. Well, because he was in his room. I don't know what he was talking about. I get out.

"Q. I am talking about when he went to see the chief mate.

"A. Yes.

"Q. What conversation took place between Mr. Prendis and the chief mate; what did he tell the chief mate and what did the chief mate tell Mr. Prendis?

"A. He told the chief mate he got hurt.

"Q. He got hurt?

"A. Yes.

"Q. And what did the chief mate say?

"A. I don't know what the chief mate say because I leave him.

"Q. You left what?

"A. I left him over with the chief mate and I get back.

"Q. You heard him tell the chief mate that he got hurt?

"A. Yes."

The foregoing testimony given on direct examination of the witness, Navas, would lead to the belief that (1) Navas went off duty when he learned of libellant's fall, (2) he apparently arrived at libellant's quarters shortly after what he believed to be the time of the injury and indications were that libellant had injured his face, (3) he physically assisted libellant to go to the chief mate and actually heard libellant tell the chief mate that he had been injured. On cross-examination it developed that the witness never overheard any conversation between libellant and the chief mate; that the witness went to libellant's room at 9 A.M. on April 2, after the witness had gone off watch;[1] that libellant was in his room at the time, and then follows:

"Q. And when you went to his room what did you observe?

"A. Well, I observed the bench was down and Mr. Prendis was holding his face and told me he got hurt.

"Q. Did he tell you he had just been hurt that very minute?

"A. Yes.

"Q. Is that right?

"A. He told me he had been hurt.

"Q. He said he had just been hurt?

"A. Yes.

"Q. Had you been with Mr. Prendis the previous evening?

"A. No."

Libellant asks this Court to accept such testimony as true. Manifestly it is utterly false and, such being the case, when various other inconsistencies are considered, the libellant's case must fail. The evidence of Navas is apparently a deliberate attempt to "frame a story" which may be helpful to libellant. The only injury to libellant's face was the effect of this fabricated testimony when it struck him on the rebound. When the testimony of Navas is compared with that of the libellant, no court in this nation could accept the evidence of both Prendis and Navas—either Navas or Prendis, or both, have testified falsely. In the opinion of this Court both have testified falsely.

There are other portions of Navas' testimony which are subjected to severe scrutiny. He described, or attempted to describe, libellant's physical condition when leaving the vessel. He stated that libellant "was bended like this (demonstrating) and I see the left side (indicating face)." He refers to the condition of the face as: "Well, like a bruise and it looked in bad shape." The deposition of Navas reflects that the libellant, Prendis, was present at the time of the taking of Navas' testimony as, on one occasion, he pointed to libellant. Prendis, the libellant, has never attempted to correct or disagree with any of the details as related by Navas; he has never denied that he told Navas that the accident had

1. The witness had previously stated he had the twelve to four watch.

598

just occurred at 9 A.M. on April 2; he has never denied that the bench was down and that he was holding his face indicating that he had just been hurt. If Navas is telling the truth, then the libellant has perpetrated a fraud upon the Court; if libellant is telling the truth, he should repudiate Navas' testimony. While the seaman is recognized as a "ward of admiralty," such a doctrine does not require the Court to be a party to an obvious fraud.

Aside from the testimony of an expert, libellant's case rests upon the deposition of Navas and, along with his own account of what happened, the deposition of one Pedersen, the fireman who occupied the lower bunk in the same quarters as libellant. Both libellant and Pedersen had the same port watch while the vessel was in New Orleans, i. e., 8 A.M. to 4 P.M. on April 1, after 4 P.M., Pedersen went ashore and did not see the libellant thereafter. Pedersen returned to the vessel the next morning around 7:30 A.M. in time to change his clothes and go to work. Apparently libellant was not in his room at that time. The main purpose of his testimony was clearly objectionable. It follows:

"Q. Did you know whether or not Mr. Prendis had been injured the next day when you came aboard the ship?

"A. No, not when I came aboard.

"Q. Did you receive any information later on as to his injuries that day?

"A. Yes. One of the juniors came down below and was telling me that he was taken off that day, and that he was helping him with his gear and driving him out to the airport. He told me that he had hurt himself.

"Mr. Johnston: I object to that as being purely hearsay, and move that it be stricken.

"Mr. Kelsey: It was one of the junior engineers. The ship is held responsible for the statements of the members of the crew.

"Mr. Johnston: I move to strike."

Obviously the foregoing testimony is rank hearsay and, therefore, inadmissible. The so-called "junior" was not called as a witness, and is otherwise unidentified. Libellant does not urge that he reported the alleged accident to a "junior." The testimony cannot be used to refute denials by other witnesses that no accident was reported by libellant.

■ In light of the discussion of the testimony referred to herein—all of which amply supports the finding that libellant's alleged fall from the bunk is a figment of his imagination conceived for purposes that are financial—it becomes unnecessary to discuss the issue urged by proctors touching upon the absence of ladders leading to upper bunks on ships. However that may be, assuming arguendo the truth of libellant's account of his fall, the Court finds that the mere absence of a ladder in a forecastle does not, standing alone, render the vessel unseaworthy or constitute negligence on the part of the owner. True, the finding of negligence would be to the contrary where a passenger is involved. The evidence adequately demonstrates that crew bunk ladders are of comparatively recent innovation; they are available on some vessels but not on others; they are sometimes permanently affixed to the bunk, and are also of a portable or movable type; some seamen desire to use a ladder while others think that the ladder is a nuisance and proceed to cast it aside or place it in a closet. Undoubtedly there was no ladder in libellant's quarters, but bunk ladders were available on the vessel.

In support of his argument that the absence of a bunk ladder constitutes an unseaworthy condition, libellant refers to this Court's opinion in Howard v. A. L. Burbank and Company, Ltd., 202 F. Supp. 8. That case involved the reversal of the safety rail on an upper bunk. The purpose of the guard rail on an upper bunk is twofold: it tends to prevent the occupant from rolling out of bed, and it also furnishes some assistance in getting in and out of the bunk. The master knew of the practice of some seamen in reversing their bunks, and freely

permitted same. The safety rail was standard equipment on all crew bunks. These facts resulted in a finding of unseaworthiness and negligence where a seaman, awakened suddenly during the night, struck his head against an open deadlight approximately eleven inches over his chest, and proceeded to roll out of the upper bunk. The foregoing is an entirely different situation from what is disclosed by the evidence in the present case with respect to the use of ladders as standard equipment. Nor is the case in any way similar to Descartes v. United States, D.C., 166 F.Supp. 803, where no stepladder was available for use on board the vessel and it was necessary for a seaman, in the performance of his duties, to replace electric light bulbs at heights not readily accessible. In short it may be said that no case has been cited, and none found, which holds that the mere absence of a crew bunk ladder, without more, constitutes an unseaworthy condition.

It has been, and undoubtedly will be, vigorously argued that the medical record lends credence to libellant's account of his injury. This fact has not been overlooked by the Court. When libellant reported to the Veterans' Administration Hospital on April 3, 1957, he stated that he "fell on ship at New Orleans (merchant marine) two days ago, injuring neck and shoulder—complaint of pain and stiffness in neck;" all of which is revealed by the medical record. He was afforded outpatient treatment for his eye condition on April 9, 16, and 18. He was x-rayed on April 3 and thereafter for his orthopedic complaints, with negative findings. He was admitted to the hospital for this latter condition on April 22. Then follows a long series of medical history, including neurological, psychiatric and orthopedic studies. From the conclusions herein reached, it is totally unnecessary to detail this testimony. It is sufficient to state that libellant has consistently told the hospitals and doctors that he injured himself when he fell from the upper bunk of the vessel—a self-serving statement which cannot, under the facts of this case, render true that which is untrue.

It may well be that libellant sustained an injury to his neck, shoulder and face. That injury may have been sustained in New Orleans, or at some other place prior to reporting to the hospital in Richmond. It could be effectively argued that such an injury was "in the service of the ship" even though it occurred ashore, and even though it may have taken place after the libellant was "signed off" the vessel at his request by "mutual consent;" the respondents apparently conceded their obligation to provide libellant with transportation to Richmond and, without so deciding, it may be appropriate to conclude that any injury sustained after leaving the vessel under such circumstances would conceivably be "in the service of the ship" to justify an allowance of maintenance and cure. However, we are asked to accept libellant's version of the accident which, for reasons previously stated, are not satisfactory. If the injuries had been sustained during a fight at New Orleans or some other place, it is still possible that the respondents would be liable for maintenance and cure but to so hold would deprive the respondents of the only available defense to an action for maintenance and cure when a seaman is "in the service of the ship," namely, that the injuries were the result of his own willful misconduct. As the preponderance of the evidence points to the fact that libellant made no complaint or report of any accidental injury after it allegedly occurred; as no credible witness has stated that he noted the effects of any such injury or otherwise immediately heard the libellant make any comment as to same; and as the Court cannot speculate that an injury was sustained "in the service of the ship," the respondents are not liable for maintenance and cure beyond that which was required for treatment of the eye condition.

█ The claim for wages to the end of the voyage is equally without merit as the termination of employment was at the request of libellant and by "mutual consent."

**600**

Adopting this memorandum in lieu of specific findings of fact and conclusions of law, pursuant to General Admiralty Rule 46½, 28 U.S.C.A., a decree will be prepared by proctors for respondents dismissing the libel—except as to any claim for maintenance and cure for the eye condition, if any be due—and, after submission to proctor for libellant for inspection and endorsement, the same shall be presented to the Court for entry.