*Northern District*

No. 6148
**FRANK M. PALMER**

v.

**BOAT EDITH L. BOUDREAU INC.**

*Present*:Brooks, P.J. Connolly & Parker, JJ.
Case tried to *Philip J. Durkin* in the District Court of Eastern Essex No. 18465.

*Brooks, P.J.* This is an action of contract in which the plaintiff seeks to recover under the General Admiralty and Maritime Law all expenses incurred by him for his maintenance, care and cure arising out of personal injuries sustained by him while he was a member of the crew of the defendant's fishing vessel.

The answer is a general denial, contributory negligence, the Court's lack of jurisdiction and that medical and hospital services and facilities of the United States Public Health Service were available to the plaintiff free of charge and therefore, he cannot recover for medical and hospital expenses incurred by him. The defense of lack of jurisdiction and of the availability of medical and hospital facilities through the United States Public Health Service was not argued and is considered waived.

*At the trial there was evidence to show that*:

The plaintiff is a resident of Gloucester, Massachusetts and by occupation a commercial fisherman. He has been employed as a fisherman for more than twenty-five years and usually shipped as cook and deckhand.

On or about *July* 1, 1964 the plaintiff was

hired as a cook and deckhand aboard the defendant's fishing vessel, EDITH L. BOUDREAU, by the captain, George M. Cressey. It was agreed that the plaintiff was to have a steady site aboard the vessel indefinitely until he quit or was discharged by the Captain for cause. The plaintiff could terminate his steady employment at any time following a trip merely by informing the owner of the vessel or the Captain that he did not intend to make the next trip. It was understood that if nothing was said or done by either party prior to or at the time of settling up, the plaintiff would make the next trip.

The plaintiff made his first trip aboard the defendant's fishing vessel, EDITH L. BOUDREAU, on or about July 8, 1964. The boat returned to Gloucester and the plaintiff was ashore for the customary two days between trips, during which time the plaintiff got things ready for the next trip; doing such things as the ordering and storing of grub aboard the vessel for the next trip. The plaintiff made the second trip aboard her, which lasted for approximately eight days and ended in Gloucester on Saturday, July 18, 1964. The catch was not unloaded but was topped with ice to wait for Monday's market.

On Sunday, July 19, 1964, the plaintiff remained at home and rested, and on Monday, July 20, 1964 at about 6:00 A.M., the plaintiff reported to the vessel to unload the fish. He and others unloaded the fish, tended the

hatch, washed pen-boards and cleaned the forecastle. This work was finished at approximately 10:15 A.M. - 11:00 A.M. and the plaintiff returned to his home where he had lunch and took a shower around noon. While taking a shower, the plaintiff slipped and fell and hurt his wrist. He returned to the Fish Pier at approximately 2:00 P.M. to settle up. He was paid for his trip and returned home again.

The pain in plaintiff's wrist got worse and that evening he went to a local hospital. The following day, July 20, a cast was applied to his wrist. The diagnosis was impacted transverse fracture of the distal radius of the right wrist.

On or about July 21, 1964, the plaintiff notified the captain, George M. Cressey, that he had been injured and that he would be unable to make the next trip. Neither the Captain nor the defendant, its agents, servants or employees had done anything prior to July 21, 1964 to terminate the plaintiff's site aboard the plaintiff's fishing vessel. A transient fisherman (meaning one who is employed on a trip-to-trip basis) was shipped in his place. The plaintiff was disabled from the date of the accident until September 18, 1964 when he was able to resume work.

At the time of the plaintiff's accident, it was the custom and practice in existence on the fishing boats going out of Gloucester, that the members of the crew could be called upon by the Captain, while ashore between

trips, to perform certain work aboard the fishing vessel, such as, mending of twine, repairing nets, ordering grub and storing grub, cleaning the galley. The injury occurred while being subject to the call of duty since he could be called upon at any time to perform above described work aboard the vessel, as well as any other duties that might arise.

Counsel stipulated that if the Court found for the plaintiff, he would be entitled to recover maintenance in the amount of $420.00 (60 days at $7.00 per day) as well as his medical and hospital bills in the amount of $232.76, the plaintiff's total damages being in the amount of $652.76.

At the close of the trial and before final arguments the plaintiff made twenty-nine requests for rulings, all of which were allowed. Defendant claims that allowance of ten of these requests were error. These requests were as follows except that plaintiff's citations have been deleted:

8. "A seaman on shore leave is still in the service of his ship.

9. A seaman is entitled to maintenance even if his injury occurred where he had gone purely for his own diversion.

10. A seaman on shore leave is still "in the service of his ship" so as to be entitled to maintenance and cure for injuries sustained whether shore leave is at a foreign port or home port.

11. A seaman or a fisherman who is em-

ployed aboard a fishing vessel and is injured or falls ill while ashore between trips in a foreign or home port is in the service of the ship in the sense of being generally answerable to the call of duty, therefore entitled to maintenance and cure.

12. A seaman is considered "in the service of the ship in the sense of being generally answerable to the call of duty" since a fisherman during said period could be called upon to perform services such as repairing nets, moving the vessel and other related activities.

14. That there is sufficient evidence to warrant a finding that the plaintiff was a member of the crew of the F/V "Edith L. Boudreau" at the time of the plaintiff's alleged accident.

15. That there is sufficient evidence to warrant a finding that the plaintiff was in the service of the ship in the sense of being generally answerable to the call of duty on or about July 20, 1964 at approximately 11:45 A.M.

27. That there is sufficient evidence to warrant the Court to find for the plaintiff.

28. That there is sufficient evidence as a matter of law to warrant a finding for the plaintiff.

29. That based upon all of the credible evidence introduced at the time of

trial, as a matter of law, a finding is warranted for the plaintiff."

Defendant filed the following requests for rulings of which all but No. 4 and No. 5 were denied:

"1. A fisherman who is between fishing trips and is injured while taking a shower in his own home is not "in the service of the ship".

2. A seaman on shore leave, in the confines of his own home, is not in the service of his ship.

3. A seaman on shore leave, but in the privacy of his own home, is not entitled to maintenance and cure for injuries sustained while in his own home.

4. There is sufficient evidence to warrant a finding that the plaintiff was not subject to call on a 24-hour a day basis.

5. There is sufficient evidence to warrant the Court to find for the defendant.

6. There is sufficient evidence as a matter of law to warrant a finding for the defendant.

7. That based upon all of the creditable evidence introduced at the time of the trial, as a matter of law, a finding is warranted for the defendant."

The Court found the following facts:

"On all the creditable evidence, including the signed statement of the Plaintiff, I find as a fact that the Plaintiff was a member of the crew of

the Boat Edith L. Boudreau, Inc., and in the service of the vessel, subject to being called back to duty on July 20, 1964, when he received his injury."

The defendant also filed a Motion for "Directed Finding" in its favor which was denied by the Court.

The defendant claims to be aggrieved by the Court's denial of the defendant's Motion For a Directed Finding, by the allowance of Plaintiff's Requests for Rulings numbered 8, 9, 10, 11, 12, 14, 15, 27, 28 and 29, and by the Court's denial of defendant's Requests for Rulings numbered 1, 2, 3, 6 and 7.

This is an action of contract under maritime law, a type of case usually brought in the Federal Court. Negligence is not an issue, neither are pain and suffering, nor impairment of earning capacity. The suit is for "maintenance and cure" in connection with plaintiff's accident while taking a shower in his home. The damages agreed on cover the period from the time plaintiff terminated his employment until he signed up for his next job, a period of sixty days at $7.00 per day in the nature of subststence, plus medical and hospital bills.

The situation is analogous to cases brought under the Workmen's Compensation statute in this Commonwealth. Although there the actions are in the nature of tort and only wages are involved, both there and in the case before us negligence of the employer and contributory negligence of the employee are

not at issue.

Whereas Workmen's Compensation is a creation of statute radically different from common law, maritime law upon which plaintiff relies is a combination of common law in that special field and subsequent statutes and regulations which spell out, but do not alter or replace the common law.

Also whereas the main issue under Workmen's Compensation may be whether the injuries arose out of and in the course of employment, under maritime law and specifically in the case before us, the main issue is whether plaintiff was "in the service of the vessel" at the time of his injury. If so, he is entitled to have all reasonable hospital and medical bills paid as a per diem payment to cover living expenses until a cure has been effected, or until it has been established that further medical care will no longer help the injured or ill seaman. To be in the service of the vessel he must be either on duty or subject to the call of duty.

Maritime common law is very ancient. The laws of Oleron are among the earliest containing special protection for seaman. Oleron was part of the domain of Eleanor of Aquitaine before she became an English Queen, wife of Henry the second and mother of Richard Coeur de Leon. These and laws of the Hanse Towns are referred to in the footnotes to the case of *Aguilar* v. *Standard Oil Company,* 318 U.S. 724.

One hundred forty-two years ago Mr. Justice Story in *Harden* v. *Gordon,* 2 Mason (U.S.) 541 set forth eloquently the basis for

the unusual protection afforded by the law to seamen.

> " 'Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. . . . . If these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen. The master will watch over their health with vigilance and fidelity. He will take the best methods, as well to prevent diseases, as to ensure a speedy recovery from them. He will never be tempted to abandon the sick to their forlorn fate; but his duty, combining with the interest of his owner, will lead him to succor their distress, and shed a cheering kindness over the anxious hours of suffering and despondency.' "

One hundred years later Judge Rutledge in the *Aguilar* case presents a fascinating account of the history of the maritime law. He prefaces this history with these statements:

> "All admit the shipowner is liable

if the injury occurs while the seaman is 'in the service of the ship,' and the issue is cast in these ambiguous terms, the parties giving different meanings to the ancient phrase. . . . .

Conceptions of contributory negligence, the fellow-servant doctrine, and assumption of risk have no place in the liability or defense against it. Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection."

There is this further appropriate excerpt from Justice Rutledge's Opinion:

"From the earliest times maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natuural elements and the limitations of human adaptability to work at sea enlarge the narrower and more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working, that accompany most land occupations. Furthermore. the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude for others to these extraordinary haz-

ards and limitations of ship life.

Accordingly, with the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon the owners of ships."

Originally, the shipowner was not responsible for injuries occurring away from the ship. The responsibility was later extended to cases where the seaman was injured while away from the ship but on ship business. The *Aguilar* case was the first case to present the issue of liability where the seaman had left the ship when injured but was still on the pier where the ship docked. In the companion case of *Waterman* v. *Steamship Corp.* 318 U.S. 724 the seaman was injured returning from shore leave on the dock where the ship was moored.

In *Farrell* v. *United States* 336 U.S. 511 the seaman was seriously injured on his way back to his ship in Palermo, Italy after overstaying his shore leave. The court there spelled out the meaning of the phrase "in the service of the ship" as follows:

"He must, of course, at the time be 'in the service of the ship' by which is meant that at the time he must be generally answerable to the call of duty rather than actually in the performance of routine tasks or specific orders."

The seaman involved in the *Farrell* case was found to be in the service of the ship.

He also was found to be disabled for life. He was suing for maintenance and cure for life, but the court in a five to four decision ruled that the doctrine of maintenance and cure did not go beyond the time when the maximum cure had been achieved plus possibly a reasonable time thereafter.

There was a further broadening of the law in *Warren* v. *United States* 340 U.S. 523. The seaman there, while on shore leave, was injured in a dance hall overlooking the Bay of Naples, Italy. During the dance he had partaken of a modest libation and was admiring the view of the Bay when his foot slipped and he fell some thirty-five feet to his severe damage. The court unanimously held that he was in the "service of the vessel." The issue was whether the accident was due to wilful misbehavior or mere negligence. The court with two justices dissenting reversed the Circuit Court, which had held that the plaintiff's conduuct had been the result of wilful misbehavior.

The court referring to the rationale of judicial solicitude for seamen said:

> "This reasoning is as applicable to injuries received during the period of relaxation while on shore as it is to those received while reaching it. To restrict the liability along the lines suggested would be to whittle it down 'by restrictive and artificial distinctions' as attempted in the *Aguilar* case. We repeat what we said there, 'If leeway is to be given in either direction, all the considerations which

brought the liability into being dictate it should be in the sailor's behalf.' "

Another step toward liberalizing maritime law is illustrated by the decision in *Smith* v. *United States* et al 167 Fed. 2nd 550 - CC, 4th Circ. 1948. Plaintiff was on shore leave in the home port. After taking a bath at his home, he went to a friend's house to spend the night. The next day, preparing to return to his vessel and while in his friend's driveway, he turned his ankle, breaking it.

Relief was denied in the United States District Court on the ground that plaintiff's visit to his friend bore no relation to his declared purpose in obtaining his shore leave, which was to go home, get certain belongings and take a bath. Quoting from Justice Story in *Reed* v. *Canfield* Fed. cases 11641 and from the opinion in the *Aguilar* case, the Circuit Court reversed the District Court saying that no distinction could logically be drawn between liability for injuries incurred in a foreign and a home port.

Then comes the case on which plaintiff most relies,— *Hunt* v. *Brighton Trawler Inc.,* 102 F. Supp. 300 decided 1952 by Judge Ford of the United States District Court, Mass. The case is almost identical with the case before us except that plaintiff was injured in his own home. Plaintiff, between fishing trips, was injured by falling on the sidewalk near his lodging. There, as here, members of the crew were subject to call between trips to perform such work as

mending nets. The issue, as here, was whether plaintiff was in the "service of the vessel" because subject to call. The court decided that he was. The case was not appealed, but in a later case, *Keeping* v. *Dawson,* 262 F. 2nd 868, Judge Ford denied relief on the ground that there was no evidence that the seaman involved could be called on to perform work such as mending nets while ashore. This fact in the mind of the judge differentiated it from the *Hunt* case. The case was appealed to the United States Circuit Court of Appeals which upheld Judge Ford, but without any indication of disagreement with him over his view of maintenance and cure as expressed in the *Hunt* case.

It is defendant's contention that *Hunt* v. *Brighton Trawler Inc.* was wrongly decided because of the court's misunderstanding of the Supreme Court's opinions in the *Aguilar, Farrell* and *Warren* cases. We are aware of the Supreme Court's growing interest over the years in human welfare and more specificially of its gradual enlargement of the doctrine "in the service of the ship" as evidenced among other things by the court's statement previously quoted from the *Aguilar* case:

> " 'If leeway is to be given in either direction, (restriction or liberalization) all the considerations which brought the liability into being dictate it should be in the sailor's behalf.' "

Also a footnote to *Mitchell* v. *Trawler Racer Inc.,* 362 U.S. 539, 1959 observes: "And of course the vitality of a seaman's

right to maintenance and cure has not diminished through the years."

Although the issues were somewhat different, the opinion in *Vaughan* v. *Atkinson,* 369 U.S. 527, 1962 quotes and affirms the doctrine of maintenance and cure as set forth in the *Aguilar* and *Warren* cases. In the *Vaughan* case the seaman had been out of service of the vessel for over two years when it was established that while in the service he had contracted T. B. He was allowed recovery. The only issues were whether he should be allowed counsel fees and to what extent his earnings as a taxi driver in the interval should be deducted. The court found in his favor on both of these issues.

All this leads us to believe that had the *Hunt* case gone to the Supreme Court the decision would have been affirmed. Also we find no more valid distinction between a case where the injury occurred on or off the plaintiff's premises than the United States Supreme Court found between the case of an injury occurring in a foreign as distinct from the home port.

While so holding we cannot help wondering how much further the courts will go on behalf of the seaman, who has come to enjoy the protection and advantage beyond almost any other type of employee in the United States. Not only have his duties become progressively less laborious and less hazardous, but his status has become more secure and his compensation far more substantial.

The ocean still possesses its perils and the gale still threatens the unwary and inexperi-

enced mariner, but the sailor no longer has to fear capture and slavery at the hands of the pirates nor the kind of fo'castle described by Richard Henry Dana and portrayed in Billie Budd, which was an important factor in this special protection for seamen. It is a far cry from the Pinta and Mayflower to the Queen Elizabeth. Furthermore girded to fight the only battle which might engage the sailor is the most powerful of the maritme unions.

We find no error in the court's disposition of the plaintiff's and defendant's requests for rulings, nor in its denial of defendant's motion for a directed verdict. Report dismissed.

Michael B. Latti for the Plaintiff.

Solomon Sandler for the Defendant.